213 So.2d 89 (1968)
CHARLES CARTER & COMPANY, Inc.
v.
Edward C. McGEE, Jr.
No. 7434.
Court of Appeal of Louisiana, First Circuit.
July 1, 1968.
Rehearing Denied August 12, 1968.
*90 Jack Wise of Caillouet & Wise, Thibodaux, for appellant.
Gerald F. Lofaso, Houma, for appellee.
Before LANDRY, REID and BAILES, JJ.
LANDRY, Judge.
This action by plaintiff Charles Carter & Company, Inc. (Carter), seeks recovery of damages from defendant Edward C. McGee, Jr. (McGee), a registered surveyor, allegedly resulting from McGee's negligence, carelessness and lack of skill in performing professional services in staking piling locations for a building project on which Carter was prime contractor. Defendant reconvened for judgment in the sum of $600.00, the agreed price for the work in question. After trial on the merits, judgment was rendered below in favor of defendant on the main demand, rejecting and dismissing plaintiff's suit. On the reconventional demand, judgment was entered in favor of McGee for the amount prayed for, with interest and costs. From said judgment plaintiff has appealed. We are in accord with the judgment of the trial court and therefore affirm the decree rendered.
The record discloses that Carter was engaged by the Roman Catholic Church of the Archdiocese of New Orleans to construct a high school complex in Houma, Louisiana. The project, designed and planned by Nolan, Norman & Nolan, Architects, New Orleans, Louisiana, called for the construction of three separate but connected and related buildings designated on the plans and specifications as Buildings A, B and C, respectively. According to the plans, the buildings were located one behind the other facing the front or northern boundary line of the construction site, Building A being situated nearest said front property line. Defendant's crew staked the piling locations called for. The pilings were then driven by a subcontractor engaged for that purpose. Shortly thereafter, when batter boards were being erected preparatory to commencing work on the foundations, it was discovered by plaintiff's carpenter foreman, Rivet, that the piling locations allowed for only a 37 foot space between Buildings A and B, whereas it was intended that this distance be 48 feet. On the advice of its architect, the owner declined to approve construction with a spacing of only 37 feet between the edifices concerned. Carter was therefore required to relocate the piling for Building A so that it would be spaced the desired 48 feet from Building B. Plaintiff's suit is for the cost of the additional work involved. Defendant's reconventional demand is for the agreed surveyor's fee which Carter refused to pay.
In essence plaintiff contends defendant was engaged on a professional basis because plaintiff desired to have the work done properly and therefore relied upon defendant's knowledge and skill. Plaintiff further argues that because of defendant's negligence, carelessness and lack of skill, plaintiff sustained a monetary loss equal to the amount required to relocate the piling. Defendant maintains the work was performed in a competent professional manner in accordance with the plans and specifications as supplemented by certain instructions from plaintiff's job superintendent, Porter. Alternatively, defendant argues *91 plaintiff was guilty of contributory negligence through the ineptness of its said job superintendent. Plaintiff counters with the argument that the doctrine of res ipsa loquitur is applicable herein thus imposing on defendant the burden of exculpating himself from the inference of negligence resulting therefrom. Plaintiff also parries with the contention that defendant possessed the last clear chance to avoid the mistake and alternatively asserts defendant is liable in solido with plaintiff as a joint tort feasor in the event Porter be found guilty of any negligence contributing to the error.
There is no real dispute on the question that the pilings as staked out by defendant would have located Building A within 37 feet of Building B instead of 48 feet as desired by the owner. Narration of certain background information, concerning which there is little or no disagreement, will afford a clearer understanding of the manner in which the error occurred.
The record contains the architect's plot plan for the project. Said plot plan is in effect a detailed drawing and portrayal of the size and shape of the three buildings and designates their precise location within the construction site in relation to the front or northern boundary line thereof and also in relation to each other. The plot plan indicates the front "building line" of Building A is 137 feet south of the northern boundary of the construction site. It also indicates that the roof line of Building A, a two-story structure, overhangs or extends northerly beyond its front building line but does not indicate the extent of said projection. The plans and photographs of Building A appearing of record indicate the structure to be approximately 107 feet wide. On either end of its northerly or front side is situated two-story brick and glass enclosed staircases, each being approximately 16 feet in width and extending northerly from the second story projection of the building a distance of about 24 feet. Between these two stairwells the first or ground floor, consisting of a glass facade approximately 74 feet wide, is overhung 11 feet by the second story. The north wall of the second story, between the enclosed stairwells, is of solid brick and supported by visible columns spaced along the northern extremity of the second story overhang between the aforementioned stairwells. Also in evidence is Architect's drawing designated S-1 which details the piling layout within each of the respective buildings. Said drawing indicates three parallel rows of 6 pile clusters extending across the main portion of Building A from east to west, the number of piles in each cluster being expressly shown. It further shows lesser pilings at the east and west ends of the northern extremity of Building A to support the stairwells located at these points. Said piling plan, however, does not specify either the front or rear building line of Building A. In addition there appears of record a drawing designated "Structural layout plan" which in essence sets forth the location of the principal superstructure columns of the entire building in relation to the pilings shown on S-1. Neither the structural layout sheet nor the piling plan indicated on S-1 relate the pilings or superstructure columns to the building line. The fact that the first or most northerly row of main pile clusters was intended to be situated approximately 11 feet north of the building line and support the columns which uphold the overhang of the second story rather than buttress the main front wall of the first or lower story is the circumstance giving rise to the error in the placement of the building concerned. More precisely, in locating Building A with reference to the front property line, the first row of pilings, which supports the overhand of the second story, was placed 137 instead of 126 feet south of the front property line thus resulting in the building line being 148 instead of 137 feet south of the front property line and consequently some 11 feet closer to Building A than called for in the plans and specifications.
*92 We first dispose of plaintiff's contention that the doctrine of res ipsa loquitur and alternatively the principle of last clear chance are applicable to the case at hand. Res ipsa loquitur is inapplicable considering the record shows, as hereinafter indicated, that defendant was not in exclusive control of the process of laying out the pilings. It suffices at this juncture to relate that plaintiff's job superintendent consulted with and furnished defendant additional information with regard to the piling locations. Since defendant lacked exclusive control of the layout procedure, the doctrine of res ipsa loquitur is not applicable. Rayner v. R. J. Jones & Sons, La. App., 182 So.2d 353.
Neither is the principle of last clear chance available to plaintiff herein. For this doctrine to apply, it must appear that the defendant was guilty of negligence constituting a proximate cause of the incident resulting in the injury or damage of which plaintiff complains. It suffices to state that for reasons hereinafter set forth, we find defendant without fault in the instant matter.
Defendant does not dispute the occurrence of the error. Neither does he seriously contest the amount which plaintiff allegedly expended in correction of the mistake. As did the trial court, we deem the pivotal issue herein to be assessment of responsibility for the error shown.
The test of liability of one employed to render professional services on the ground that he has been deficient or remiss in the performance of such services is well stated in Pittman Construction Co., Inc. v. City of New Orleans, La.App., 178 So.2d 312, from which we quote with approval the following:
"In determining the liability of Godat, the same standard of care applied in the case of architects, physicians, attorneys, and others engaged in professions requiring the exercise of technical skill should be applied. The test is whether he performed his service in accordance with the skill usually exercised by others of his profession in the same general area; and the burden of proving he did not, is upon the party making the charge, in this case the City, third-party Plaintiff. The City has not discharged this burden here because all expert testimony vindicates the professional skill and judgment exercised by Godat in this case."
The Court further commented that:
"`The undertaking of an architect implies that he possesses skill and ability, including taste sufficient to enable him to perform the required services at least ordinarily and reasonably well, and that he will exercise and apply in the given case his skill and ability, his judgment and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result. It will be enough that any failure shall not be by the fault of the architect.' * * *
"Further, use of the term `architect' is intended to cover `engineers' as well * * * expert testimony is needed to establish lack of care and resulting negligence on the part of architects and engineers."
We see no reason why the above stated rule should not apply to surveyors.
The lower court found that resolution of the question posed depends upon the adequacy of the plans and specifications furnished by plaintiff to defendant and the existence of a work sketch purportedly drawn by defendant after consultation with plaintiff job superintendent who signified his approval thereof. In effect the trial court concluded the plot plan and the foundation plan for Building A furnished defendant by plaintiff were not sufficient in themselves for defendant to accurately locate the pilings within the building layout or foundation plan for Building A. The lower court also found that a work sketch drawn by defendant for use by his survey crew was prepared by defendant on additional *93 information furnished by plaintiff's job superintendent, which said additional information was vital and not shown on any plans made available to defendant. In addition, the trial court found that the sketch in question was approved by plaintiff's job foreman as being correct and it was on the basis of this drawing that the pilings were actually laid out. Finally, the trial court found that plaintiff failed to discharge the burden incumbent upon it to show that defendant had not performed the professional services involved with that degree of skill customarily exercised by others in his profession in the same general area.
Plaintiff's chief witness was its job superintendent, Oscar L. Porter (Porter). Mr. Porter testified defendant was furnished with the plot plan (designated as Sheet No. 1) which shows the front building line of each building and the distance that each said building line is to be situated south of the front property line. He also stated defendant was furnished foundation plans for all three buildings, Sheet S-1 being the foundation plan for Building A and which depicts the piling locations thereof. Porter further noted that the foundation plans indicate the number of piles in each "cluster" and the center line of each footing or pile cluster. Porter acknowledged that whereas McGee had access to the complete project plans (a key to the work shack in which a complete set was kept being given to defendant), nevertheless, defendant was not specifically furnished any sheets excepting those showing the plot plan and foundation plans as these were the only sheets defendant required to perform his work. Porter testified further that he advised defendant of the overhang beyond the front building line of Building A, and that he, Porter, did not anticipate any confusion over this circumstance. Porter acknowledge that none of the plans indicated the space to be left between the respective buildings and that the plot plan shows only the distances between the front building line of each structure. He further stated that if the building line of the front of Building A were properly situated (to allow for the fact that the front row of piling supports the second story roof overhang rather than the front wall of the first or ground floor), the remaining buildings would automatically have the proper spacing. According to Porter, defendant's crew laid out the rear building (Building C) first, then B and A in turn, working from the rear toward the front as is customary in such cases. He also testified that when all pilings had been driven, it was discovered that the pilings for Building A were situated 11 feet south or to the rear of where they should have been. When first examined, Porter did not recall the existence of a sketch drawn by McGee to supplement the plans which Porter had furnished the latter. When called in rebuttal, however, Porter acknowledged he had seen McGee's crew chief using a sketch but that Porter had neither prepared nor approved same. Finally, Porter stated it was not his responsibility to supervise any subcontractor's work and that he did not agree to supervise or check defendant's calculations; he also denied having directed defendant as to where to lay out Building A or any of the other structures.
Thomas B. Holcombe, Jr., a partner in the firm of Nolan, Norman & Nolan, the architects who prepared the plans in question, testified that the architectural plans for the project were drawn under his general supervision, the structural plans and drawings involved being prepared by the firm's consulting engineers, Fromherz Engineers. According to Holcombe, a surveyor using the plot plan and individual foundation plans, should be able to properly locate the pilings for each structure. Holcombe stated further that it was not unusual that the structural and foundation plans did not show the building lines. He explained that it was discretionary with the engineer preparing the plans to either indicate or not indicate the building lines thereon. In Holcombe's opinion, the error *94 in question consisted of locating the first or front row of piling for Building A on the building line thereof instead of 11 feet to the front or north of the building line. He was of the further opinion that it would be most unusual for the contractor or his project superintendent to check the work of a surveyor engaged to stake out piling locations for work of this nature.
The error involved was discovered by Lloyd Rivet, plaintiff's carpenter foreman. It suffices to relate that Rivet's testimony was somewhat confusing and contradictory in explaining the manner in which the mistake was disclosed. Rivet did testify, however, that he consulted Sheet No. 2 (the first floor plan of Building A) to determine what he called the width (actually the depth) of Building A. Having thus ascertained the width (depth) of Building A, he was then able to compute the distance from the rear of Building A to the front building line of Building B. Rivet acknowledged that said Sheet 2 was not used by defendant McGee.
Toxie Craft, a self-employed Civil Engineer, called by plaintiff, testified that the building line and piling line are not necessarily the same on all construction plans. He stated that neither the foundation plan for Building A nor Sheet S-1 indicated the location of the building line, therefore, according to Craft, location of the building line required the acquisition of additional information. He also stated that upon facing such a problem, he would most certainly consult the job superintendent. Craft also testified that it was normal practice in the profession to prepare a surveyor's work sheet showing the necessary dimensions which sheet would then be rechecked against the plans for accuracy.
Defendant McGee testified that while his crew of assistants was engaged in running the center line for the buildings, he was in the construction shack reviewing those portions of the plans pertaining to their task. He also stated that to simplify his crew's work, he prepared a sketch showing the distances between each row of piling and each building as well. He acknowledged that Porter advised him as to the overhang of the roof on Building A, and that after reviewing the entire project with Porter, he prepared the sketch and Porter agreed that was the manner in which the building should be located. According to McGee, his crew used the sketch in laying out the center line of each building and every row of piling in the respective structures. He explained that the work was accomplished by surveying down the established center line and marking the various rows of piling all in one "shot" proceeding from front to rear. McGee also stated that after setting the center line showing the distances between buildings and piling rows, the crew only rechecked as each building was laid out commencing first with Building C in the rear and then proceeding to B and A, in turn. He testified positively that Porter agreed to check behind the survey crew to make sure the buildings were correctly situated. He also testified that when the survey work was complete, he returned the plans to Porter along with the sketch that he drew to determine building placement and piling spacing.
Gene Henry Johnson, defendant's crew chief, testified that defendant and Porter prepared a sketch which Johnson used to lay out the center lines of the buildings. He also stated that after setting the center line, he used the sketch to set a stake on the center line to indicate where each row of piling should be located. He further testified that having set these points, he needed only the foundation plan which he received from Porter to finish the location of the pile clusters. Johnson additionally stated that he personally returned Sheet S-1 and McGee's drawing to Porter. Finally, Johnson testified that on occasions Porter checked the piling locations staked out by Johnson and his crew.
In effect Johnson's testimony regarding the use of McGee's drawing and Porter's checking of pile locations was corroborated *95 by Alton Knight, the instrument man in Johnson's crew.
Bernard Davis, a self-employed civil engineer, summoned by defendant, testified that he had been engaged by plaintiff to lay out the center line of the buildings and stake the location of some test pilings before defendant was employed to stake out the piling locations. He related that upon being so employed, he consulted with one of plaintiff's employees and together they made a drawing containing dimensions necessary to locate the center line of the buildings and the sites of the desired test piling. He also stated that on this occasion he examined the plot plan, foundation plans and some of the floor plans. Davis also stated that if engaged to stake out the piling locations for the buildings, he would first have established the center line of the buildings as shown on the plot plan to fix the location of the pilings with reference to the building line. He explained that the plot plan showed the front building line of Building A to be a brick line and that nothing on either the foundation plan or Sheet S-1 indicated where the building was situated with reference to the pile clusters. He further stated that in view of the status of the plans, to stake the location for Building A additional information would be required. In such circumstances, he explained, he would contact his employer, the contractor, for such necessary additional data. In concluding, Davis explained that the procedure outlined by McGee in preparing the work drawing or sketch was customarily followed in the surveying profession and that he would have followed substantially the same modus operandi in staking the piling locations had he done the job himself.
In view of the testimony of record, we hold, therefore, the evidence, preponderates in favor of the finding that the plans provided defendant did not contain sufficient information to enable establishment of the piling locations within the building site to correlate the position of Building A with respect to that of Building B. We also find that it was necessary for defendant to obtain additional data in order to ascertain the proper alignment of the buildings. Since the plans did not per se contain sufficient information to permit his interpretation of their intent in this respect, it appears he followed the procedure normally and usually invoked by surveyors in the area, namely, he consulted a representative of the contractor for additional data. In this connection we point to the testimony of the witness Davis who stated in substance that in making the preliminary survey for staking test piling, he also prepared a work sketch with the assistance and approval of plaintiff's superintendent, Porter.
We find, as did the trial court, that defendant did in fact prepare a work sketch with Porter's assistance and approval. In this regard we note that while Porter denied he approved such a sketch, he conceded having discussed the plans with defendant at least to the extent of pointing out that there was a roof overhang on the front of Building A. It is of further significance that while Porter alluded to the overhang, at no point did he relate the overhang to the front row of piling for Building A. Also significant is the fact that the plans were silent as to this vital factor.
Nor do we find defendant negligent in not consulting other sections or sheets of the plans from which he might perhaps have discovered the error. The gist of the expert testimony of record is to the effect that the sheets furnished defendant by Porter would normally contain all information necessary. If these were deficient, it is shown that the usual and customary procedure is to obtain all further required information from a representative of the contractor. This the defendant did in the case at hand. We can only conclude, therefore, that the information furnished by Porter led defendant to believe that the location of the front row of piling for Building A was the same as the front building line of that structure.
*96 Under the circumstances we hold that plaintiff has failed to discharge the burden incumbent upon it of proving defendant's failure to exercise that degree of care and skill exercised by others in his profession in the same general area. Consequently, plaintiff may not recover herein. Pittman Construction Company, Inc. v. City of New Orleans, La.App., 178 So.2d 312.
Accordingly, the judgment of the trial court is affirmed in all respects. Costs to be paid by plaintiff-appellant.
Affirmed.