249 So.2d 254 (1971)
CALANDRO DEVELOPMENT, INC.
v.
R. M. BUTLER CONTRACTORS, INC. and United Bonding Insurance Company.
No. 8360.
Court of Appeal of Louisiana, First Circuit.
May 31, 1971.
*255 Leon Gary, Jr., of Ellison & Gary, Baton Rouge, for appellant.
Marcel Livaudais, Jr., of Loeb & Livaudais, New Orleans, A. Leon Hebert of Hebert, Moss & Graphia, Baton Rouge, Drury, Lozes & Curry, New Orleans, for appellee.
Before LANDRY, ELLIS and BLANCHE, JJ.
LANDRY, Judge.
The principal and res nova question involved in this appeal is whether the surety on a defaulting contractor's performance bond has a cause of action in tort against the engineer who designed and supervised construction of a subdivision for a third party owner in whose favor the performance bond was given. We find that such a cause of action does exist, but that the claim asserted herein must be denied for reasons hereinafter set forth. Incidental to this main issue is the question whether the owner-obligee in a construction contract performance bond may sue the surety thereon for such items as added interest cost incurred on a construction mortgage loan attributable to the fault of the defaulting contractor. Under the circumstances of this case, we deny recovery for such items.
This litigation evolved as a concursus proceeding invoked by Calandro Development, Inc. (Owner), in which Owner impleaded *256 R. M. Butler Contractors, Inc. (Contractor), and also impleaded several lienors of the construction project together with United Bonding Insurance Company (United), the surety on Contractor's performance bond.
Pursuant to an oral contract of employment, Owner engaged Boudreaux Fergus Consulting Engineers (Engineer) to design and supervise construction of a residential subdivision known as Acadian Gardens Subdivision (Acadian), situated in Donaldsonville, Ascension Parish. The construction site was surveyed, a hospital site of undetermined acreage was carved therefrom, and Engineer prepared all plans and specifications for the necessary sewerage lines, street paving, sidewalks, curbing and drainage facilities. Contractor, the sole bidder on the project at a price of $79,000.00, was awarded the contract with the approval of the Engineer. The contract specifies that Contractor shall post a performance bond, with acceptable surety, in the contract sum. The contract also contains the following provisions:
"Upon failure on the part of the contractor to forthwith comply with any order of the engineer made under the provisions of this article, the engineer shall have the authority to cause defective work to be remedied or removed and replaced an unauthorized work to be removed and such costs to be deducted from any monies due to or to become due to the contractor, or the engineer if he so elects may withhold any money due or becoming due to the contractor until such time as the work is satisfactorily corrected.
"Concrete shall be placed only on a subgrade prepared and maintained as specified and only when the subgrade has been approved by the Engineer.
"No work shall be done, no materials used, without suitable supervision or inspection by the Engineer or his representative."
Work on the project commenced on or about August 1, 1966, and continued until approximately October 15, 1966. Subsequently, on February 1, 1967, Contractor was formally placed in default after having received payments aggregating $64,188.69 for work performed. Owner then deposited the remaining $14,811.31 due under the contract into the registry of the trial court and invoked this concursus proceeding.
The trial court awarded Owner $41,700.00 against United, which sum was found to be required to correct defective work and complete the contract. Owner was awarded an additional $2,811.35 against Contractor, which sum was subordinated in rank and privilege to certain lien claimants. United third partied Engineer and Engineer's insurer claiming Engineer is liable in tort to United for any claims United is obligated to pay Owner. United bases its claim on the premise that the duty of inspection owed by Engineer to Owner pursuant to Engineer's oral contract with Owner, and the provisions of the construction contract between Owner and Contractor, is also owed to a surety as well, and that Engineer negligently failed to discharge said obligation.
United appeals rejection of its demands against Engineer. Owner has appealed seeking recovery from United of the following items of expense allegedly incurred as the result of Contractor's default and the attending delay in project completion: (1) Interest in the sum of $34,036.95 paid on construction loans from the time of scheduled completion until final completion; (2) engineering fees paid Engineer in the sum of $4,170.00 for preparing plans for correction and completion of the project; (3) attorney's fees in the sum of $12,500.00 incurred in the concursus proceeding; (4) depreciation of subdivision lots, $38,940.00, and (5) damages to Owner's reputation as a subdivision developer, $50,000.00. A lienor, Altex Ready Mixed Concrete Corporation, has appealed seeking recovery of *257 attorney's fees incurred in the concursus proceeding.
There is little, if any, dispute concerning the facts of this case.
Mr. Joseph D. Calandro (Calandro), president and sole proprietor of Owner, is a builder and developer with extensive experience spanning a period of 22 years. By verbal agreement, he engaged Engineer, at an agreed price of $7,900.00, to survey, stake out and supervise construction of the project. He relied on Engineer to check progress on the work and authorize periodic payments to the Contractor on the basis of completed work. He expected Engineer to directly supervise the work and provide such inspection to insure that the contract would be properly executed. Calandro could not recall whether Engineer suggested that Calandro engage a construction testing laboratory to make compaction tests and check the laying of forms and pouring of concrete streets to be constructed. Calandro was certain, however, he did not inform Engineer not to employ a construction testing laboratory for the project. Calandro concedes that during the approximately eight weeks of construction, he visited the site once or twice weekly. On approximately ten to fifteen of these occasions, he saw either Paul Boudreaux (Boudreaux), a senior member of Engineer, or a subordinate employee, Marshall, inspecting the project.
On Contractor's third pouring of concrete streets (which were to be six inches thick), Calandro noted the surface was improperly finished in that it had a "rub board effect" which condition was called to Boudreaux's attention. Calandro also observed considerable curbing was not properly finished and street drainage was defective. After Contractor had been placed in default and cleanup operations undertaken to determine the status of the project, it was discovered that the street paving was broken and crumbled in several areas. This condition was found to be due to the fact that a considerable portion of the streets were poured with only two inches of concrete instead of six. Calandro concedes that at least one, and perhaps two, progress payments were made to Contractor after defects were noted. These payments, he stated, were made on Boudreaux's assurance the Contractor would correct the defects before final acceptance. Calandro paid Engineer $4,170.00 to prepare plans to correct the defects and complete the project. Pursuant to these plans, Pearce and LeBlanc, contractors, completed the work at a cost of $41,700.00 to Owner.
In essence, Boudreaux testified that the project in question is considered a small job in engineering circles. In such cases, it is not customary to provide full time supervision and inspection unless the owner so desires and pays therefor. He stated that in the profession, a 10% of construction cost fee (which he charged the owner in this instance) imposes on the Engineer the following duties only: (1) Initial survey of the land and map preparation; (2) preparation of construction plans and contractual documents; (3) staking out the construction site and furnishing grades for streets, sidewalks, sewer lines, drains, sewer connections in individual lots, and similar services; (4) preparation of a final plat; (5) staking out individual lots, and (6) periodic inspections of the work in progress. In this instance, the Engineer performed the additional service of surveying the site of a hospital that was to be constructed on part of the tract from which the subdivision was carved. Boudreaux explained that for the fee charged, engineering supervision consisted only of visual, casual type inspection of the work in progress. If further inspection were desired by the owner, it would be either in the form of a resident inspector or engineer provided at owner's expense, neither of which was required by Calandro. Boudreaux recommended that Calandro engage a construction testing laboratory to insure the contractor's faithful performance of the work, but Calandro declined because of the added expense involved. Boudreaux noted *258 that during construction he personally visited the work site approximately seven to ten times, and that his party chief, Harrell Marshall visited the scene approximately the same number of times. After the contractor's first pouring of concrete streets, Boudreaux noted the finish was poor and the curbing was wavy. He instructed Contractor to repair these defects and was assured the imperfections would be corrected.
It developed that the first 1800 feet of streets laid by Contractor were of uniformly poor finish. On two occasions, Calandro inspected the streets with Boudreaux. On one of these instances, Calandro offered to lend Contractor some concrete finishers employed by Calandro. A twenty-foot section of street was poured and left totally unfinished. Boudreaux informed Contractor that the condition of the street rendered it unacceptable as well as certain curbing which was also found defective. Thereafter the apparent quality of Contractor's work improved to the extent Boudreaux considered it average and some corrections were made in streets and curbing already laid. In addition, Contractor agreed to rectify all defective work before final acceptance.
The construction contract calls for retainage of 10% of the aggregate unit cost of all work paid for. In making the payments to Contractor herein, a sum in excess of 10% was retained. Boudreaux stated that the sum of $14,811.31 withheld would have been sufficient to correct defects known at the time of Contractor's default. The amount proved inadequate, however, when it subsequently developed that hidden defects existed and that unpaid bills for material had been allowed by Contractor to accumulate, of which circumstances Boudreaux was not aware.
Following default by Contractor, Boudreaux made a detailed inspection of the project and found the following defects: (1) Lots were not dressed; (2) the job site was not cleaned up; (3) the ditch on the eastern side of the site needed grading; (4) metal drainage pipe ends were damaged at one point; (5) a water main was broken; (6) the street had numerous holes where it was two inches thick and not six inches thick as specified in the contract; (7) drainage inlets on the lots were higher than the curb; (8) the sewer lines needed pumping out; (9) some drainage inlets were blocked with mud; (10) street signs were not installed; (11) rip-rap was not grouted; (12) outfall pipe was blocked; (13) the sidewalk was broken at one location; (14) the curbs were in their entirety defective because they were installed without dowels; (15) a barricade on one street was not installed; (16) a spoil bank from a large ditch at the south end of the property had never been spread and graded, and (17) the manhole bottoms were not all bottomed with concrete. Such items, except for the concrete work, were considered minor and to be items normally attended to at the end of construction.
Mr. Boudreaux asserted that he was never at the job site when concrete was poured, but that he did observe the proper six inch forms being laid. The fact that the concrete was not of sufficient depth was not observable until it began to break up after default and while the streets were being used by trucks hauling concrete for the hospital project being constructed on adjacent property. Some of the curbing, being narrow, obviously did not have dowels in it. Mr. Boudreaux asserted that he did not inspect the sewer lines because the city normally made such inspection prior to assuming the responsibility of maintaining such lines. In this instance, if the City of Donaldsonville had not inspected the lines before final completion, he would have done so. He explained that it is useless for the Engineer to inspect the sewer lines which will be taken over by a maintaining authority because that authority will make its own inspection and requirements before accepting the work. He also declared that all defects of which he was aware were made known to Calandro and that he notified Butler that final acceptance would *259 not be tendered until all defects were corrected. The sum of $4,170.00 was charged Calandro for correction plans provided.
Mr. Russell Orgeron, an employee of Pittsburgh Testing Laboratory, testified that he inspected subject job site on March 21, 1967. The sewer lines were found to require cleaning and draining before they could be inspected by lamping. He found that one manhole had no concrete bottom and another was discovered to have a mortar mix bottom and not a concrete bottom as specified in the Butler-Calandro contract.
Sidney M. Blanchard, employee of Pittsburgh Testing Laboratory, took corings of the paved streets after default and before corrective work was commenced. Eight cores revealed paving to a depth of two inches, eighteen cores showed concrete between two and three inches thick, and ten cores disclosed a thickness of between three and four inches. Some of the concrete, the latest poured by Contractor, met the contract thickness of six inches.
Paul James LeBlanc, sole owner of the firm of Pearce and LeBlanc, contractors, testified that he contracted to make all needed repairs for $41,700.00, and did so with no engineering supervision other than that exercised by Engineer prior to Contractor's default. He explained that the street finish was poor, the curbs were defective and did not permit proper drainage, all of the curbing had cracked where it joined the street and approximately half of the individual lots had no lateral lines to the main sewers. He stated that repair to sewers required removal of some sidewalks. He explained that all streets in the subdivision were given an asphalt topping sufficient to bring them to proper grade. Where there was two inches or less of concrete, the slabs were torn out, replaced with a four inch concrete base, and topped with at least two inches of blacktopping. In other areas where there was more than two inches, but less than four inches, the thickness was increased to four inches and then blacktopped to grade. In this manner, the subdivision was converted from one having concrete surfaced streets to blacktopped streets. LeBlanc noted that the depth of poured concrete could not be determined by visual inspection. LeBlanc considered the original contract a small job on which a resident inspector would not normally be engaged."
Mr. Louis M. Landry, Realtor and subdivision developer, testified in essence that lots facing a concrete street generally have a valuation of $10.00 per front foot greater than lots fronting on a blacktopped street. He corroborated the finding that before corrective measures were taken, subject subdivision had leaning sidewalks and bumpy streets. Landry also noted that it is not standard procedure for an engineer to place an inspector on a construction job every day. Landry also stated that usually the Engineer asks the owner what steps the owner wishes to take regarding testing and inspecting during work progress. Landry further stated it was his own personal practice to engage his own laboratory inspector to remain on the job. According to Landry, it is not normal for the Engineer to visit the construction site daily.
James R. Clary, Civil Engineer, testified he never undertakes a project of the magnitude involved without employing the services of a resident engineer or testing laboratory. He conceded that the engineer is usually not present when concrete streets or curbs are poured or laid. However, he stated that customarily the engineer checks the grade and a testing laboratory checks for proper soil compaction before such work is done. Clary acknowledged that poor surface finishing of streets cannot be detected until work is completed and cleanup operations conducted. He also stated that defective surface finish is not necessarily an indication of improper subgrade preparation or insufficient thickness of concrete. In his practice, the finding of defective work does not require immediate correction. He stated that it matters not whether imperfections are corrected immediately or *260 before final acceptance. He further stated if a contractor were bonded, he would not shut down a job because of defects; he merely requires corrections before finally accepting the job on behalf of the owner. Clary stated that sewer lines and connecting laterals are not inspected until a project is completed. For a 10% fee, Clary would not provide a resident engineer, but would go on the job occasionally and see what the work looked like. He suggests the hiring of a testing laboratory, but if the owner does not furnish this service, he, Clary, takes no extra precautions. For the fee involved, Clary would provide detailed information and surveys to insure proper grades as well as sizes, shapes and types of construction and stake out services. He exercises no control over the contractor's work methods. He also stated it is not improper engineering practice to pay a contractor for concrete laid even though it is partially defective and may require corrective measures.
Toxie Craft, Civil Engineer, testified in essence that he considered a job of this size large and one requiring an inspector. He understood that a contract calling for "general supervision" by the engineer entailed establishing grades and following the progress of the work to insure performance as near to the contract specifications as possible. Under no circumstance would he allow pouring of concrete without his having checked the subgrade. He stated that it is his custom to explain to the owner the latter's need for laboratory testing and inspection, and if the owner makes no response, he would engage such services at the owner's expense. He also stated that if an owner refused to pay for such services, he would increase the degree of his supervision, and attempt to recover the value thereof from the owner. He stated that under the circumstances of this case, he would have shut the job down if the contractor had not made the needed repairs immediately when the need therefor became apparent. In Craft's opinion, the degree of supervision called for depends upon the contractor's ability, actual performance and reputation for reliability. He also considered it the duty of the engineer to protect the owner without additional compensation, if necessary. Craft conceded that sewer inspections are not made until the project is tendered by the contractor as completed and ready for final acceptance.
Jack Perrault, Consulting Engineer, stated that an engineering contract calling for "general supervision" by the engineer usually means periodical and occasional visits to the job site to ascertain that the work is proceeding according to the plans and that the owner is generally getting what he pays for. He noted that concrete thickness is sometimes checked by digging to expose the slab edge but that this method determines the thickness at the edges only. He further stated that sewer lines are almost always inspected by the governmental authority which eventually undertakes maintenance, and that the construction engineer seldom, if ever, makes such an inspection. Under this particular contract, if the owner did not provide additional supervision, Perrault would have made only periodic visits to the site. He considered the control authority vested in the engineer by the construction contract binding on the contractor only, not the engineer. Perrault explained that these control factors are written into the construction contract to be used in the discretion of the engineer who may or may not invoke them as he sees fit. Perrault considered subject contract a small one. If he had been the engineer, he would merely have recommended that Owner engage either a lab or full time inspector to protect the Owner's interests.
Mr. James Cady, an employee of United, stated that he issued the bond in question predicated on the provisions of the construction contract requiring engineering supervision of the work.
United claims Engineer owed it an independent duty, separate and apart from any obligation due owner, to adequately supervise the work to insure completion *261 substantially in accord with the contract plans and specifications. It is urged that Engineer breached this duty by failing to make adequate inspections of the work in progress, authorizing payments for defective work, failing to suggest and recommend that owner withhold sufficient funds to correct known defects, and neglecting to halt construction until known defects were corrected by the Contractor. United maintains that Engineer was aware at all times that United would rely on the supervision to be exercised by Engineer, and the breach of said obligation renders Engineer liable herein.
In so contending, United relies on Aetna Insurance Company v. Hellmuth, Obata & Kassabaum, Inc., 8 Cir., 392 F.2d 472, which held that, under Missouri law, a surety may recover for loss occasioned by an architect's negligence in failing to properly supervise a construction project where the architect is contractually obligated by contract or agreement to supervise construction. Conversely, Engineer cited and relies upon Texas Tunneling Company v. City of Chattanooga, Tennessee, 6 Cir., 329 F.2d 402, which held that a third party not in privity with the engineer, namely, a subcontractor, had no cause of action in law against the engineer who omitted test borings in a report to the project owner. The lack of privity between claimant and engineer was the decisive factor relied upon in Texas Tunneling Company, above. It appears that this precise issue was never been considered by our own courts.
In Aetna Insurance Company, above, it was noted that the requirement of privity as a basis for liability in relationships of this nature was postulated in Winterbottom v. Wright, an old English case, 10 M. & W. 109, 152 Eng.Rep. 402 (1842) on two basic considerations: (1) It avoided unlimited liability to an unlimited number of persons, and (2) it insured that parties to contracts would have control over their agreements. In Aetna Insurance Company, above, the court noted that imposing liability in favor of the surety upon the architect would not expose architects to unlimited liability to an unlimited number of persons. On the contrary, it was observed that architects must be deemed aware that inspection provisions as between them and an owner are as much for the protection of the surety as the owner. It was also noted in Aetna, above, that imposition of liability on the architect in favor of the surety would not deprive the owner and architect of control over their contract because the adoption of terms increasing the performance risk released the surety. On this basis, it was concluded that privity was not a prerequisite to the surety recovering from the architect because the underlying policies upon which the privity requirement was based were not operative.
In Texas Tunneling Company v. City of Chattanooga, supra, a sub-contractor on a sewer tunnel project instituted suit against an engineering firm which had omitted certain test borings in a report to the city on the proposed work. Plaintiff-subcontractor asserted that it relied on defendant-engineer's report to its detriment, and that defendant must be deemed aware of such reliance when it submitted its report. The court determined the issue to be whether Tennessee law recognizes a cause of action in tort in favor of one not in privity with the alleged tort feasor based on a negligent as opposed to an intentional misrepresentation. Recovery on behalf of the subcontractor was denied.
In Peerless Insurance Company v. Cerny & Associates, Inc., D.C., 199 F.Supp. 951, it was held that a surety could recover against an architect who negligently released a ten per cent retainage on a construction contract. In this respect, the court stated:
"Privity of contract between plaintiff and defendant was not a prerequisite to the existence of the defendant-architect's duty in the foregoing respect, for the reason that said architect's duty to protect the Owner and the subrogated surety arose out of the general and mutual *262 contractual arrangements which included resulting independent rights and obligations. Nor is privity of contract a requisite to make effective said duty, the violation of which constitutes actionable negligence.
"To state it otherwise, defendant-architect undertook the performance of professional conduct, which, if negligently performed, would obviously cause loss to the Owner and/or plaintiff-surety. Under such circumstances, the law imposed upon defendant a duty to exercise due care to avoid such loss, and plaintiff-surety was not required to anticipate that retainage funds would be wrongfully released."
In State, for Use of National Surety Corp. v. Malvaney et al., 221 Miss. 190, 72 So.2d 424, an architect was held liable to a surety for negligently releasing retainage funds in a construction contract. In Fidelity & Casualty Company of New York v. J. A. Jones Construction Company, 325 F. 2d 605, an architect was held liable to an injured employee of the contractor for failing to shut down a portion of the construction project because of a dangerous condition known to the architect.
In Westerhold v. Carroll, Mo., 419 S.W. 2d 73, an indemnitor of a surety recovered from an architect who incorrectly certified the amount of work completed and of materials furnished. With respect to the surety's reliance on the contractual obligations existing between architect and owner, the court in Westerhold, above, stated as follows:
"While it is not specifically alleged that in issuing the bonds Maryland Casualty Company relied on the provisions of the construction contract providing for inspection and supervision of the work by defendant and also relied on the provisions for payment by the owner only upon certificates of defendant, it is a fair inference from the facts alleged that Maryland Casualty Company knew of those provisions and appreciated the fact that `to guarantee the performance of a contract where progress payments are adequately safeguarded is a less hazardous risk than to guarantee the performance of a contract where there are no safeguards.'"
The court proceeded to delineate the issue as follows:
"Plaintiff's petition is based on negligence, and the immediate issue is whether in the absence of privity of contract the facts stated in the petition imposed upon defendant a legal duty to the surety to exercise ordinary care in executing the certificates called for in the construction contract, so that he would not authorize payments to the contractor in excess of the amount provided for in the construction contract."
In Westerhold, above, the court was careful to declare that whether the requirement of privity should be relaxed should be determined on a case-to-case basis. In this respect, two opinions of Judge Cardozo, Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425, and Ultramares Corporation v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139, were cited. In Glanzer, above, a public weigher was held liable to the purchaser of beans for incorrectly weighing the beans. The court found that under the circumstances, the person who would be injured by the weigher's negligence was known, there was a certainty of injury if the weight was incorrectly ascertained, and the "end and aim" of the transaction was for the benefit of the purchaser, a party to the lawsuit. In Ultramares, supra, public accountants incorrectly made and certified a balance sheet upon which plaintiff relied in making a loan to the company whose financial status was reflected by the balance sheet. Liability was denied on the ground that it would result in rendering the accountants susceptible to liability for an indeterminate amount for an indeterminate time to an indeterminate class. Glanzer, above, was distinguished on the ground that the service *263 therein was rendered primarily for the information of a third person whose connection with the transaction was so close "as to approach that of privity, if not completely one with it", whereas, in Ultramares, the service was primarily for the client. The court in Westerhold, above, in granting the indemnitor of the surety recovery against the architect, characterized the relationship between the architect and the surety as so close as to approach that of privity. In this respect, it was further noted that the person who could be expected to be injured by negligence of the architect was known, namely, the surety, and the end and aim of the provision of the contract with respect to payments was for the benefit of the surety, as well as for the owner. It was also noted that dispensing with the requirement of privity would not lead to excessive and unlimited liability or produce endless complications in ascertaining cause and effect. The court in Westerhold, above, adopted the following test for determining whether or not privity could justifiably be dispensed with in cases of this nature:
"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm."
This court must first determine whether an absence of privity between the architect and surety precludes, as a matter of law, a suit by the surety against the architect. The weight of common law authority, as noted above, is that such suit by the surety is not barred as a matter of law. Defendant Boudreaux, relying on Day v. National United States Radiator Corporation et al., 241 La. 288, 128 So.2d 660, and J. B. Thomas v. Fromherz Engineers et al., La.App., 159 So.2d 612, asserts that, according to Louisiana law, a surety is precluded from suing an architect. Such assertion is unwarranted. In Day, supra, the survivors of an employee of a subcontractor were denied recovery against an architect. The architect had, by written contract with the owner, undertaken to exercise "adequate supervision of the execution of the work to reasonably insure strict conformity with the working drawings, specifications and other contract documents" and this supervision was to include "frequent visits to the job site." The decedent sustained fatal injuries while installing a hot water heater which was defective in that it lacked a pressure safety valve. The court delineated the issue as follows:
"The narrow question here presented is whether the architect's contract with the owner imposed upon them the duty to be aware that the boiler was being installed by Vince, the plumbing subcontractor, and whether they were required by their contract to inspect the hot water system, of which the boiler was a part, during installation and before the boiler was tested by the subcontractor Vince."
The court stated in denying plaintiffs' recovery:
"As we view the matter, the primary object of this provision was to impose the duty or obligation on the architects to insure to the owner that before final acceptance of the work the building would be completed in accordance with the plans and specifications; and to insure this result the architects were to make `frequent visits to the work site' during the progress of the work. Under the contract they as architects had no duty to supervise the contractor's method of doing the work. In fact, as architects they had no power or control over the contractor's method of performing his contract, unless such power was provided *264 for in the specifications. Their duty to the owner was to see that before final acceptance of the work the plans and specifications had been complied with, that proper materials had been used, and generally that the owner secured the building it had contracted for.
Thus we do not think that under the contract in the instant case the architects were charged with the duty or obligation to inspect the methods employed by the contractor or the subcontractor in fulfilling the contract or the subcontract. Consequently we do not agree with the Court of Appeal that the architects had a duty to the deceased Day, an employee of Vince, to inspect the hot water system during its installation, or that they were charged with the duty of knowing that the boiler was being installed."
On initial consideration of the question in Day, above, the Supreme Court was most careful to point out that it did not hold that plaintiffs therein could under no circumstances recover from defendant-architect in a wrongful death action. In this respect, the court stated:
"Before discussing this holding we should point out that we do not have here a case where the architects failed to provide in the specifications for a pressure relief valve on the boiler and for other safety devices; or a case where they inspected and approved the installation, or even where they had knowledge of the installation and stood by and permitted the boiler to be tested without having proper safety devices; or a case where they visited the site after the completion of the installation and, knowing that the boiler was to be tested, failed to observe that the boiler was not equipped with the safety devices stipulated in the specifications. Under such circumstances we should not hesitate to say that they breached a duty and that they reasonably should have foreseen that this breach would cause damage."
More significant, however, is that on rehearing in Day, above, the court clearly indicated that if breach of duty and proximate causation were both found to be present, liability would have been decreed. The court expressly noted, however, that no breach of duty was found.
In J. B. Thomas v. Fromherz Engineers et al., above, an employee of a project contractor instituted suit against the project engineer for injuries sustained when a piling fell from the lead line of a pile driver and struck plaintiff. In denying recovery, the court quoted the following language from Day, above:
"Under the contract they as architects had no duty to supervise the contractor's method of doing the work. In fact, as architects they have no power or control over the contractor's method of performing his contract, unless such power was provided for in the specifications."
Plaintiff was denied recovery in Thomas, above, on the ground that no duty, either contractual or delictual, could be found as the basis for defendant's liability. In this respect, it was noted that defendant engineer had no contractual or actual control over the contractor's equipment or its operation.
Although Day, above, does not expressly mention privity, the clear import of the decision is that a third party who is not in privity may, nevertheless, have an action in tort against an architect or engineer. We understand Day, above, to hold in effect that where there is no privity of contract, the third party may still have a cause of action against the architect or engineer provided there is breach of a duty owed independently of the contract between the owner and architect or engineer. Day, above, and Thomas, above, did not consider whether the relationship between surety and engineer, in cases of this nature, was so close as to approach privity, and therefore justify the finding that a duty is owed *265 by an architect or engineer to the surety on a contractor's bond.
We note that it is customary for owners to require their contractors to furnish bond for the faithful performance of the work undertaken. An engineer or architect must be deemed and held to know that his services are for the protection, not only of the interests of the owner, but also the surety on the contractor's bond who has no supervisory power whatsoever, and who must perforce rely on the architect or engineer to produce a completed project conformable with the contract plans and specifications. This conclusion was reached in the authorities above cited. This rule does not expose engineers and other similar professionals to indeterminate liability to an undefined number or classes of persons. On the contrary, it imposes liability to a known party, namely, the surety on the contractor's bond, for an amount certain, that is, the contract price agreed upon by owner and contractor. As noted in Westerhold, above, control of the owner-contractor agreement is not lost by the parties thereto by allowing the surety a cause of action against the engineer because any change in contract rendering it more onerous releases the surety. Therefore, the dual considerations which dictate privity as a prerequisite to liability are absent in instances of this nature. We are also of the view that the nature of the relationship between surety and engineer is tantamount to one of privity. We find sufficient legal basis for affording the surety a cause of action under the circumstances.
We hold that the degree of care owed by an engineer to a surety is the same as that owed to the owner. Our jurisprudence uniformly holds that the duty owed by those practicing learned professions to their clients, patients or retainers, is that of exercising that degree of professional care and skill customarily employed by others of the same profession in the same general area. This test has been applied to engineers in Pittman Construction Co. v. City of New Orleans, La.App., 178 So.2d 312; to architects in Maloney v. Oak Builders, Inc., La.App., 224 So.2d 161; to surveyors in Charles Carter & Co. v. McGee, La.App., 213 So.2d 89; to beauticians in Mixon v. Brechtel, La.App., 174 So. 283; to physicians in Mournet v. Sumner, 19 La. App. 346, 139 So. 728, and to dentists in Thibodeaux v. Aetna Casualty & Surety Co., La.App., 216 So.2d 314.
In instances of this nature, the burden is upon plaintiff to establish the degree of care and skill required by local standards of the professional involved. Maloney v. Oak Builders, Inc., La.App., 224 So.2d 161. Plaintiff must likewise prove failure of the professional to exercise the degree of care required. Charles Carter & Co. v. McGee, 213 So.2d 89.
In this instance, the contract between Owner and Engineer was verbal. However, the contract between Owner and Contractor, which was prepared by Engineer, provides as follows:
"No work shall be done, or materials used, without suitable supervision or inspection by the Engineer or his representative."
The contract also provides that:
"The Engineer or his agent shall be in direct charge of the work and shall have full authority in directing the proper performance thereof."
According to the expert, Perrault, such construction contract provisions are considered in the profession as binding upon the contractor, not the engineer. They are standard provisions included by the engineer to afford additional protection for the owner. They are to be exercised by the engineer when, in his discretion, it becomes necessary. Assuming these provisions were part of the contract between Owner and Engineer, we do not consider them so broad as to require such engineering supervision as to guarantee and insure contract completion *266 in absolute conformity with contract plans and specifications.
In this instance, the expert testimony is in hopeless conflict concerning the extent of supervision and inspection required by the phrase "suitable supervision and inspection."
Boudreaux testified that for the fee charged, the phrase in question called only for occasional visual type inspection to determine that plans and specifications were being observed. Mr. Perrault, Engineer, testified that the phrase employed required only periodical job site visits to ascertain that the work in general is proceeding according to plan and that the owner is getting what he paid for. Mr. Craft, Engineer, was of the opinion the size of the project required a resident inspector or at least an inspection of the subgrade before concrete was poured. He conceded an extra engineering fee was justified if a resident inspector were engaged by the engineer. Mr. Clary, Engineer, was of the view the project required a resident inspector, and that it is customary to check subgrade before concrete streets are laid. Mr. LeBlanc, an experienced contractor, substantiated the testimony of Boudreaux and Perrault regarding the degree of supervision customarily exercised by engineers on projects of the magnitude involved herein.
Beyond question, Engineer furnished some degree of supervision by visiting the job site on at least ten to fifteen occasions. These inspections disclosed visible defects which were called to the contractor's attention. The contractor was advised that Corrections were necessary, and Owner was apprised of the conditions noted. The record before us does not establish by a preponderance of evidence that "suitable inspection" in this instance required the Engineer to either secure or procure a resident inspector or testing laboratory to check work progress in order to conform with local professional practice. Additionally, it does not appear that the number of inspections made in this instance was so insufficient as to constitute negligence on the Engineer's part. Notwithstanding the numerous imperfections involved, it appears beyond question that several of such items are not customarily required to be finished or corrected until the project nears completion. Such unfinished items as lot dressing, ditch grading, cleaning sewers, installing street signs, erection of a barrier, and repairing damaged drainage pipe ends, are not shown to be of a nature sufficient to arouse a suspicion of possible default. The major defect was to the streets. It is shown that such defects are best prevented by engaging either a resident inspector or testing laboratory which Owner declined to employ because of the additional cost. Engineer observed that proper sized forms were on the job for the street paving work. It does not appear that he was necessarily negligent in not being on hand when actual street paving was in progress.
We find that plaintiffs have failed to establish the degree of professional care and skill demanded of Engineer by a preponderance of evidence as required by law. It follows that no breach of Engineer's duty has been shown.
We also find no merit in the contention that Engineer was negligent in approving payments to Contractor knowing that certain defects existed in the work. Engineer reported all observable defects to Owner who made the payments notwithstanding such information. Owner was not required to make the payments, but elected to do so. We fail to see wherein the Engineer was at fault in this regard.
Altex Ready Mixed Concrete Company has appealed seeking an award of attorney's fees incurred in the concursus proceeding. The following stipulation between Altex and United concerning in part attorney's fees appears of record:
"Altex Concrete Company, and United Bonding Company has (sic) reached a *267 stipulation which we would now put into the record, that the claim of the Altex Concrete Company, filed in its answer to the concursus in this matter, for fifteen thousand nine hundred seventeen dollars and sixty-six cents ($15,917.66) is correct in amount; that it represents invoices for concrete delivered to the jobsite on the job in question; that a lien for that amount was filed by the Altex Concrete Company and that the amount remains unpaid and that the Altex Concrete Company waives its claim for attorney's fees under the said claim in the amount of 10 per cent of its claim, or fifteen hundred ninety-one dollars and seventy-six cents ($1,591.76)."
Altex asserts that United has failed to honor the above stipulation by appealing suspensively the judgment in the concursus proceeding. It is further alleged that the suspensive appeal taken by United delays the payment of the stipulated amount to Altex and deprives Altex of the current conventional rate of interest. It is also asserted that the claim for attorney's fees pursuant to LSA-R.S. 9:3902 was waived on the condition that United would stipulate as to the amount of Altex's claim.
The stipulation of record does not reveal that attorney's fees were waived on any conditions whatsoever. Moreover, there is no testimony of record evidencing that there were any conditions to the waiver of attorney's fees.
United has in no way sought on appeal to alter its liability with regard to Altex. This court, therefore, cannot find that United has violated either the letter or the spirit of the stipulation. There is no provision in the law which warrants awarding Altex any measure of compensation for the difference between the current conventional interest rate and the legal interest rate.
Owner's right to recover of the surety such items of expense as interest, diminution in property value, engineering fees for corrective plans and specifications, attorney's fees incurred in concursus proceedings, and damage to Owner's professional reputation allegedly resulting from Contractor's default, must be determined in the light of the bond provisions. The pertinent part of the bond reads as follows:
"Now, Therefore, the condition of this obligation is such that, if the Principal shall faithfully perform the contract on his part, and shall fully indemnify and save harmless the Obligee from all cost and damage which the Obligee may suffer by reason of failure so to do and shall fully reimburse and repay the Obligee all outlay and expense which the Obligee may incur in making good any such default and shall pay all persons who have contracts directly with the Principal for labor or materials, then this obligation shall be null and void, otherwise it shall remain in full force and effect."
We interpret the provision to mean that the surety agrees to reimburse the owner all expense and outlay incurred in making good the contractor's default. A fair and reasonable interpretation of the language employed is that the surety promises to assume the expense of completing all defective or unfinished work left by the contractor to the end that the owner is assured a project completed in accord with the contract plans and specifications. The sum of $41,700.00 paid Pearce and LeBlanc to complete the project, and also the aggregate of $4,170.00 paid Engineer for preparation of additional plans and specifications for the correction and completion of the defective and unfinished work left by Contractor, are items recoverable by Owner from its surety. Interest, attorney's fees, depreciation of subdivision lots and damage to Owner's professional reputation are unrelated to actual finishing costs and are not contemplated by the bond provisions. These latter items, therefore, must be denied.
*268 It is ordered, adjudged and decreed that, in addition to the judgments rendered in favor of plaintiff, Calandro Development, Inc., against defendant, United Bonding Insurance Company, by the trial court, said plaintiff is hereby awarded judgment against said defendant in the additional sum of $4,170.00, together with legal interest from date of judicial demand, until paid; this award being subordinate in rank to all other claims allowed by the trial court in this concursus proceeding pursuant to LSA-R.S. 9:4804.
It is further ordered, adjudged and decreed that in all other respects, the judgments rendered below in these consolidated cases are affirmed; all costs of these proceedings to be paid by United Bonding Insurance Company.
Amended and rendered.
ELLIS, Judge (concurring).
Although I agree with the conclusion reached by the majority, I cannot agree with the holding that "the degree of care owed by an engineer to a surety is the same as that owed to the owner."
I think that a cause of action in tort may exist under Article 2315 of the Civil Code if the facts of the particular case are such as to justify finding a duty owed by the engineer, reliance thereon by the surety, and a breach of that duty by the engineer. See Day v. National United States Radiator Corporation, 241 La. 288, 128 So.2d 660, 666 (1961).
I cannot agree that the duty arises as a matter of law when an engineer enters into a contract with an owner, simply because the owner has a bonded contract with his contractor.
Nor can I agree that the concept of privity of contract has any place in the determination of tort liability, which may exist independently thereof.