McCLENDON, J., dissenting.
The majority errs in concluding that Jacobs owed a duty to Lathan, with whom it had no contractual privity. The majority cites Calandro ,[1] Colbert ,[2] and *11 Harris Builders[3] as authority for extending Louisiana law beyond its previous limits. However, all of these cases involved either engineers or architects that drafted or prepared plans and/or specifications, but with whom the third party had no contractual privity. Further, the principal concern in these cases was foreseeability and reliance, i.e., it was reasonably foreseeable that a third party would rely on the professional's plans and/or specifications in completing a construction project.
The majority recognizes that Lathan did not rely upon plans and specifications prepared by Jacobs. Rather, the contract between Jacobs and the RSD specifically provided that the objective was for Jacobs to "assist the RSD in managing implementation of a multi-site capital plan." (Emphasis added.) Jacobs' duties, as reflected in the portions of the contract set forth in the majority opinion, involved services such as inspecting, validating cost estimates, providing document quality assurance/quality control review, processing and documenting contractor's submittals, verifying accuracy of paid quantities, reviewing punch list items, and monitoring and documenting all time and material change orders. Further, the contract provided as follows:
3.3.4 Notwithstanding anything in this section, the PM/CM [Jacobs] shall not be responsible for any design work or the acts or omissions of the professional design consultant or for the failure of the professional design consultant to carry out any of its work in accordance with the terms of its contract with the RSD.
* * *
3.6 Notwithstanding anything above, the PM/CM shall not have control over or charge of or be responsible for a contractor's means, methods, techniques, sequences, procedures, or safety programs, construction defects or the failure to detect any construction defects. The PM/CM shall not be responsible for any construction work or have control over the acts or omissions of a contractor or its subcontractors or suppliers, or for the failure of any of them to carry out any work in accordance with the terms of the contractor's agreement with the RSD.
Clearly, the RSD hired Jacobs to oversee the project and Jacobs' duty was to RSD, with whom it had contractual privity.
In extending the duty beyond the owner, the majority concludes that "[s]hould Jacobs delay the inspections or 'negligently' refuse to recommend substantial completion,... then it is foreseeable that its actions could cause economic harm to Lathan." However, merely because Jacobs could potentially cause economic harm to Lathan is insufficient to create a duty giving rise to tort liability. The majority cites no Louisiana state case where such a duty has been extended to a project manager, who is retained to protect the interests of the owner and whose obligations to the general contractor on the project are limited. See Stelko Electric, Inc. v. Taylor Community Schools Building Corp ., 826 N.E.2d 152, 160 (Ind.Ct.App. 2005) (In affirming the grant of a motion for summary judgment in favor of a construction manager against a subcontractor, the appellate court stated: "While [subcontractor] alleged that it had to follow [construction manager's] schedules, from the terms of the [owner/construction manager] Contract, *12 [subcontractor] should have known that [construction manager's] services were not to benefit [subcontractor], but instead to keep the Project organized for [owner].")[4]
The majority also references a trial court decision in Kappa Development & General Contracting Company v. City of Biloxi , Cause No. A2404-14-cv.00176 (Harris Country Circuit Court, Second Judicial District, State of Mississippi 7/21/16). However, in that case the court also refused to extend liability to a program manager. Therein, Kappa, the general contractor, entered into a contract with the City of Biloxi to repair damage to the City's infrastructure caused by Hurricane Katrina. HNTB Corporation entered into an agreement for professional services with the City to serve as program manager on the City's behalf. As program manager, HNTB's role was to "assist the City in bringing to completion ... projects to repair the City's infrastructure caused by Hurricane Katrina and to support the design, construction, and evaluation thereof." After Kappa encountered unexpected sub-surface conditions, it sued, among others, HNTB, alleging:
HNTB had a duty ... to exercise the appropriate knowledge and skill of a professional engineering corporation in the management and administration of the contract during the project with Kappa. HNTB breached its duty and was negligent by failing to properly administer the contract thereby causing Kappa to experience unreasonable delay and incur extra cost and expense to construct the project.
HNTB subsequently filed a motion for summary judgment, urging that it owed no duty to Kappa. In granting the motion, the court noted that while Kappa may have a claim against the City for breach of contract, no separate claim existed against HNTB. The court reasoned that HNTB "was neither an architect nor the engineer on the subject project" and "did not perform professional services on which third-third parties reasonably rely." As such, the court "decline [d] to create such a duty in tort without clear precedent for doing so."
Similarly, in Ratcliff Architects v. Vanir Constr. Management , 88 Cal.App. 4th 595, 106 Cal.Rptr.2d 1 (2001), the court, in sustaining a construction manager's demurrer, refused to extend a duty from a construction manager to an architect where the architect alleged that the construction manager's negligent performance impacted the architect's services, costs, fees, and profits. The architect urged that it was "reasonably foreseeable" that the construction manager's actions would adversely impact the architect, and the architect was not compensated for the extra work the architect had to expend based on the construction manager's negligence. The architect urged that public policy supports *13 finding a duty of care because it will discourage "negligent and careless behavior by construction managers." Id. at 606, 106 Cal.Rptr.2d 1. The court noted, however, that the owner retained the construction manager with the principal purpose of ensuring that an expert manager supervised the construction project. The court found that the construction manager's duty was to the owner and if a duty were owed to the architect it "would represent a conflict of loyalty" for the construction manager. Id. Moreover, the court noted that the owner held the decision about whether to pay the architect for any extra costs or overtime, and absent privity, the connection between the construction manager and architect was tenuous. Id. at 607, 106 Cal.Rptr.2d 1. Additionally, the court noted that policy considerations arising from a prior settlement entered between the owner and construction manager were also a factor. Id. Accordingly, despite the prior settlement, the court explicitly "refuse[d] to expand tort liability to include a duty of care from the construction manager to project architect. The policy considerations overwhelmingly weigh against creating such a duty. " Id. (Emphasis added.) See also Insurance Company of the West v. O'Brien-Kreitzberg, Inc., 2002 WL 1609049 (Cal.App. 1 Dist. 2002) (unpublished).
Considering the foregoing, I cannot conclude that the contract between Jacobs and the RSD created any duty in favor of Lathan nor did Jacobs render any professional services that would give rise to tort liability in this case.
Even so, Lathan submits that Jacobs had the "power of economic life and death over the contractor," which should give rise to liability in its favor. In Colbert , the court noted that one of the rationales for imposing liability on architects in favor of contractors with whom they are not in privity is the degree of control exercised by the supervising architect over the contractor, specifically, "[t]he power of the architect to stop the work alone [that] is tantamount to a power of economic life or death over the contractor." Colbert v. B.F. Carvin Construction Co. , 600 So.2d 719, 724 (La.App. 5th Cir.), writs denied, 604 So.2d 1309, 1311 (La. 1992) (quoting United States v. Rogers & Rogers , 161 F.Supp. 132, 136 (S.D.Cal. 1958) ). See also In re Hughes-Bechtol , 124 B.R. 1007 (Bankr.S.D.Ohio 1991).[5]
Even if this court were to adopt the test enunciated in Colbert and extend it to a project manager, Lathan failed to show that it would be able to meet its burden of proof at trial that Jacobs had such expansive authority. Specifically, Nicholas Amort, a project manager for Jacobs who was involved in the management of the project at the William Frantz School, attested that Jacobs did not sign any change order or any of the twenty-two CCD's issued on the project. Mr. Amort also attested that Jacobs was not expected to respond to any RFI's (Requests for Information), as they were created by Lathan and responded to by Billes, the project's architect. Moreover, Mr. Amort attested that any work change proposal requests were issued by Billes to Lathan, that Jacobs did not sign these forms, nor was Jacobs obligated or expected to respond.
*14 Additionally, in support of its motion for new trial, Lathan relied upon the deposition testimony of Ms. Lona Hankins, executive director of the major capital projects of the RSD, who confirmed that the RSD maintained control of the project.[6] Specifically, although Jacobs was responsible for more than eighty tasks on the project and while the RSD relied heavily upon Jacobs' recommendations, Ms. Hankins indicated that in a FEMA-funded project such as the Frantz School, the RSD could not abdicate its responsibilities and must be the ultimate decision maker with respect to the contracts with the contractor. Ms. Hankins, who indicated that she has experience in the construction industry, testified that she visited the Frantz School during construction to "[c]heck up on what Jacobs/CSRS [was] telling me." Moreover, she testified that she had weekly meetings with Jacobs' representatives where she was either "questioning progress" or confirming what she had seen on her site inspections. She confirmed that "[s]o much of this process between RSD and Jacobs/CSRS is a very collaborative process. And it's a back and forth on what is best for the children of New Orleans."
Ms. Hankins indicated that Jacobs could not sign any change orders and that she would not have signed a change order without Jacobs' recommendation, but in most instances there would have been a collaborative process leading to that recommendation. Ms. Hankins confirmed that the RSD did not sign "just because Billes or Jacobs approves or recommends something" and that the RSD exercised its own discretion in deciding whether to sign a change order. Moreover, Ms. Hankins indicated that Jacobs did not have authority to stop work on the project. Accordingly, given the RSD retained ultimate control, I cannot conclude that Jacobs had the power of economic life or death over the contractor.[7]
In light of the foregoing, I find no error in the trial court's grant of summary judgment in favor of Jacobs, nor any error in the trial court's denial of Lathan's motion for new trial. Further, despite Lathan's purported need to undertake additional discovery, Lathan did not seek to avail itself of the benefit of LSA-C.C.P. arts. 966(B) and 967(C) by formally requesting additional time or moving for continuance of the summary judgment hearing in order to undertake discovery. See Bardwell v. Faust , 06-1472 (La.App. 1 Cir. 5/4/07), 962 So.2d 13, 20-21.
Considering the foregoing, I respectfully dissent and would affirm the ruling of the trial court.

Calandro Dev., Inc. v. R.M. Butler Contractors, Inc. , 249 So.2d 254, 265 (La.App. 1 Cir. 1971).

Colbert v. B.F. Carvin Construction Co. , 600 So.2d 719, 723 (La.App. 5th Cir.), writs denied, 604 So.2d 1309, 1311 (La. 1992).

Harris Builders, L.L.C. v. URS Corp. , 861 F.Supp.2d 746 (E.D. La. 2012).

In Stelko, 826 N.E.2d at 160, the contract between the construction manager and owner had language similar to the contractual language used in this case. It provided:
The Construction Manager, except to the extent [it can schedule and coordinate], and Architect will not have control over or charge of and will not be responsible for construction means, methods, techniques, sequences or procedure, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility ... and neither [the Construction Manager or Architect] will be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents. Neither the Construction Manager nor the Architect will have control over or charge of or be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other person performing portions of the Work.

In In re Hughes-Bechtol, 124 B.R. at 1020, the court concluded that a debtor/contractor alleged a sufficient nexus between it and the project manager to state a cause of action against a project manager, even though the two were not in privity, where the project manager was the debtor's sole contact with the State/owner and the project manager possessed the power and authority to "stop the work" and exercise a "power of economic life and death over the contractor."

I note that Ms. Hankins' deposition was submitted in connection with the motion for new trial and is in the record.

Additionally, even if a LUTPA claim is viable absent a duty, Lathan has not shown that Jacobs' conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious such that Lathan can prevail on a LUTPA claim at trial.