600 So.2d 719 (1992)
Charles R. COLBERT
v.
B.F. CARVIN CONSTRUCTION CO. and B.F. Carvin.
No. 91-CA-384.
Court of Appeal of Louisiana, Fifth Circuit.
April 28, 1992.
Rehearing Denied May 21, 1992.
*720 Randall L. Kleinman, Hulse, Nelson & Wanek, New Orleans, for plaintiff/appellant.
William S. Marshall, New Orleans, Robert L. Raymond, Destrehan, for defendant/appellee.
Before GAUDIN, GRISBAUM and WICKER, JJ.
WICKER, Judge.
This appeal arises from a reconventional demand filed by B.F. Carvin, individually, and B.F. Carvin Construction Company alleging Charles R. Colbert's negligence with regard to a public school renovation contract between B.F. Carvin Construction Company and Orleans Parish School Board. The jury found Colbert, the architect for the project, to be 50% negligent in comparison to Carvin, individually, but 47% negligent in comparison to B.F. Carvin Construction Company. The jury award was $29,000.00 to Carvin, individually, and $89,763 to B.F. Carvin Construction Company. The trial judge granted a judgment notwithstanding the verdict and awarded B.F. Construction Company $190,985.10 reduced by 25% representative of its negligence and Carvin $58,000.00 reduced by 25% for Carvin's negligence. Colbert had pled prescription relative to the claim by Carvin, individually, and the trial judge overruled that exception. Colbert suspensively appealed the adverse judgment. We reverse in part and affirm in part.

EXCEPTION OF NO CAUSE OF ACTION:
We note at the outset that Colbert's counsel has filed the peremptory exception of no cause of action in this court. He asserts the reconventional demand states no cause of action on the ground that there is no legally recognized cause of action for negligent interference with contract. As stated in Teachers' Retirement System v. La. St. Employees, 456 So.2d 594, 598 (La. 1984), "The peremptory exception may even be noticed by either the trial or appellate court on its own motion." See also La.C.Civ.P. arts. 927, 928, 2163.
The allegations in the reconventional demand are in pertinent part as follows:
XIV.
At all times pertinent herein, Charles R. Colbert was the architect on the project designated as "Interior and Exterior Renovations to McDonough No. 36 Elementary School," on which project B.F. Carvin Construction Company, Inc. was the general contractor.
XV.
At all times pertinent herein, B.F. Carvin was the president of B.F. Carvin Construction Company, Inc.
XVI.
Because of negligent acts or omissions constituting fault on the part of Charles R. Colbert, plaintiffs in reconvention have suffered damages, for the following, to-wit:
XVII.
Defendant in reconvention failed, in surveying the project, to prepare adequate plans and specifications that would reasonably notify a bidding general contractor of the scope of the work to be done.

*721 XVIII.
Defendant in reconvention failed, during the pendency of the project, to furnish, with reasonable promptness, additional instructions and clarifications, by means of drawings or otherwise, necessary for the proper execution of the work.

XIX.
Defendant in reconvention has sought, by economic pressure such as the withholding of his recommendation to the Orleans Parish School Board of payment for amounts due, to compel plaintiffs in reconvention and their subcontractors to perform extra work not included in the plans and specifications and has refused to provide change orders and compensation therefor.

XX.
Defendant in reconvention has refused to timely inspect the areas of the work that have been completed and has caused plaintiffs in reconvention to provide maintenance services not contemplated by the original contract between the Orleans Parish School Board and B.F. Carvin Construction Company, Inc. by utilizing economic pressures such as those described in the preceding paragraph.

XXI.
Plaintiff in reconvention, B.F. Carvin, has personally suffered mental anguish and emotional distress as a result of the action or failures to act of defendant in reconvention as outlined above in Paragraphs XVIII. through XX. and otherwise.

XXII.
Plaintiff in reconvention, B.F. Carvin Construction Company, Inc., itemizes its damages as follows:
Remaining amount due on contract with Orleans Parish School Board that has wrongfully been held for reasons of fault and negligence on the part of defendant in reconvention$130,629.00
Lost overhead and profit$90,000.00
Uncompensated for extras$179,408.00
Loss of anticipated profits from other business in which B.F. Carvin Construction Company, Inc. could not participate because of the added work on the Mc-Donough project resulting from the fault or negligence of defendant in reconvention$250,000.00
Total$650,037.00
XIII.[sic]
Plaintiff in reconvention, B.F. Carvin, itemizes his damages as follows:
Mental anguish, emotion distress and frustration and pain and suffering $500,000.00
While plaintiffs in reconvention have pled intentional interference with contract and negligent interference with contract as causes of action, they have also pled a tort based on Colbert's allegedly negligent professional undertaking with Orleans Parish School Board allegedly causing foreseeable economic harm to the Carvin interests. The threshold issue before this court is whether a cause of action exists in Louisiana for any of these theories.
The Louisiana Supreme Court recognized "a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La. 1989) at 234. The Spurney court noted in dicta at 232-234:
Louisiana is now the only American state that does not recognize the action for tortious interference with contractual relations. [citations omitted].
* * * * * *
Moreover, a delictual rule such as Kline v. Eubanks [, 109 La. 241, 33 So. 211 (1902) ] that flatly and without good reason deprives an innocent person of any remedy for damage to his contract right caused intentionally and improperly by a corporate official is discordant with the fundamental civil law principle that *722 obliges a person to repair damage caused another by his fault. La.Civ.Code art. 2315.
* * * * * *
Accordingly, our courts' previous expressions barring absolutely any action based on a tortious interference with a contract are annulled insofar as they conflict with this opinion. [citations omitted]. It is not our intention, however, to adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of "a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way." [citation omitted]. Some aspects of this tort have been subjected to serious criticisms, leaving open a good many questions about the bases of liability and defense, the types of contract or relationship to be protected, and the kinds of interference that will be actionable. [citations omitted].
The Spurney court specified it was only recognizing the duty owed by a "corporate officer" in this regard.
However, it is not so clear whether a broad remedy exists with regard to the tort of intentional interference of contract. The Fourth Circuit has declined to expand such a tort beyond the narrow confines of Spurney. Tallo v. Stroh Brewery Co., 544 So.2d 452 (La.App. 4th Cir.1989), writ denied, 547 So.2d 355 (La.1989).
In his concurring opinion to Tallo, supra, Chief Judge Schott noted at 455:
While the present case does not involve the same situation as the one in 9 to 5, I am not convinced that the Supreme Court's recognition of a cause of action for tortious interference with contract is limited to the narrow situation presented in the case. However, if the cause of action is to be expanded I consider it to be the Supreme Court's function to do so and not ours as an intermediate appellate court.
Even assuming Spurney welcomes the expansion of intentional interference with contract so that the reconventional demand does state a cause of action in this regard our review of the record convinces us that only the theory of negligent interference with contract was placed before the jury. Furthermore, we note that counsel for the Carvin interests stated the following in the "Memorandum In Support of the Motion to Strike Affirmative Defense and to Limit Testimony Accordingly":
The reconventional demand by Carvin against Colbert sounds entirely in negligence and is based on Civil Code Article 2315. [emphasis added].
Additionally, the jury was only charged on negligence pursuant to La.Civ.Code Arts. 2315 and 2316. The jury interrogatories were also addressed to negligence.
We note that there is as yet no remedy in Louisiana for negligent interference with contract. Great S.W. Fire Ins. v. CNA Ins., 557 So.2d 966 (La.1990). In Great S.W. Fire Ins., at 969-970 the Supreme Court explained:
This court recently recognized for the first time in some 87 years the possibility of a narrowly drawn action for intentional interference with contractual rights and indicated that it would proceed with caution in expanding that cause of action. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989)[.]
Interference with contract, its modern inception lying in "malice," has remained, at common law, almost entirely within the province of intentional torts; and when various forms of negligence have either prevented or rendered more burdensome the performance of a contract, liability has generally not been extended [citations omitted].
[e]xcept for a very few cases to the contrary, there is little authority for negligent interference with contract in general. [Prosser and Keeton on Torts Section 129 at 1000 (5th ed. 1984) ].
This court recently concluded no cause of action existed by a landlord against a bank for negligent interference with a lease contract. *723 Frisard v. Eastover Bank For Savings, 572 So.2d 343 (La.App. 5th Cir.1990).
We now address the issue of whether Louisiana recognizes a tort based upon a negligent professional undertaking by an architect. We find support for such a cause of action and note we implied such a cause of action exists with regard to a surveyor/appraiser in R & R Enter. v. Rivers & Gulf Marine Survey, 476 So.2d 12 (La.App. 5th Cir.1985).
In R & R Enter. we considered the granting of a motion for summary judgment in a suit for damages brought by a purchaser of a riverboat. The purchasing company alleged it "detrimentally relied on Rivers and Gulf's expertise" in preparing a survey and appraisal at the request of a bank. Id. at 13. It was alleged the marine surveyor was negligent by failing to adequately inspect the premises and that the surveyor "failed to disclose the hidden defects and actual conditions of the hull." Id. We concluded there were no issues of material fact and that the granting of summary judgment was proper. The issue of whether a third party could recover economic damages for a negligent professional undertaking by a surveyor/appraiser to one not in privity was not squarely before us in R & R Enter., however, we tacitly gave approval to such a cause of action by ruling on the summary judgment and by failing to notice on our own motion the petition's failure to state a cause of action.
We also remanded a case to the trial court to allow a general contractor leave to amend his petition against an engineering firm should he state a cause of action based on tort rather than on contract. Impressive Builders v. Ready Mix, Inc., 535 So.2d 1344 (La.App. 5th Cir.1988). In Impressive Builders we held there was no privity of contract sufficient to support a contract claim. In that case the contractor sued for breach of contract against the engineering firm for allegedly designing a defective foundation slab. The allegations were vague regarding the relationship between the parties. Nevertheless, we recognized the possibility a tort claim might lie. However, we did not define the parameters of such a claim in Impressive Builders.
The Louisiana Second Circuit has allowed recovery for economic damages for a lender against a professional construction appraiser and inspector who had incorrectly reported information to a builder. Alley v. Courtney, 448 So.2d 858 (La.App. 2nd Cir. 1984), writ denied, 450 So.2d 360 (La.1984). In Alley at 860 the court held, "Privity of contract is not necessary in an action for damages under these circumstances."
The United States Eastern District of Louisiana has allowed economic damages to a contractor against an architect on claims that the architect:
prepared defective and inadequate drawings, plans, and specifications upon which [the contracting firm] relied in performing its obligations under the construction contract ... required [the contracting firm] to perform work beyond that called for in its contracts and unreasonably delayed approval of shop drawings and other documents submitted by [the contractor].
Farrell Const. v. Jefferson Parish, 693 F.Supp. 490, 491 (E.D.La.1988), reversed on other grounds, 896 F.2d 136 (5th Cir.1990).
In Standard Roofing Co. v. Elliot Const., 535 So.2d 870 (La.App. 1st Cir. 1988), writ denied, 537 So.2d 1166, 1167 (La.1989), reconsid. denied, 539 So.2d 627 (La.1989) the First Circuit recognized an action in negligence by a subcontractor against a project architect with whom there was no privity. See also Calandro Development, Inc. v. R.M. Butler Contr., Inc., 249 So.2d 254 (La.App. 1st Cir.1971).
The Fourth Circuit also recognizes a cause of action in negligence against an architect by a subcontractor not in privity with him. S.K. Whitty & Co. v. L.L. Lambert, 576 So.2d 599 (La.App. 4th Cir.1991), writ denied, 580 So.2d 928 (La.1991); Gurtler, Hebert & Co. v. Weyland Mach. Shop, 405 So.2d 660 (La.App. 4th Cir.1981), writ denied, 410 So.2d 1130 (La.1982).
In the 1950's courts in America began expanding the liability of architects to third parties with whom they were not in privity. Note, The Crumbling Tower of Architectural *724 Immunity: Evolution and Expansion of the Liability to Third Parties, 45 OHIO ST.L.J. 217 (1984); Note, Liability of Architects and Engineers to Third Parties: A New Approach, 53 NOTRE DAME LAW. 306, 309-11 (1977).
The rationale for imposing liability was clearly stated in United States v. Rogers & Rogers, 161 F.Supp. 132, 136 (S.D.Calif. 1958):
Altogether too much control over the contractor necessarily rests in the hands of the supervising architect for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor. The power of the architect to stop the work alone is tantamount to a power of economic life or death over the contractor. It is only just that authority, exercised in such a relationship, carry commensurate legal responsibility. [Emphasis added].
The Minnesota Supreme Court recognized a claim by a general contractor against an architect for the architect's negligently performing architectural services on the project although there was no contractual relationship between these parties. Prichard Brothers, Inc. v. Grady Co., 428 N.W.2d 391 (Minn.1988). See also Forte Bros. v. National Amusements, Inc., 525 A.2d 1301 (R.I.1987). In an earlier decision by a Minnesota appellate court the court considered whether an engineer could be liable in negligence to a subcontractor relying on the engineer's professional services. Waldor Pump v. Orr-Schelen-Mayeron & Assoc., 386 N.W.2d 375 (Minn.Ct.App.1986). In concluding there was such a duty owed the Waldor Pump court explained the prevailing jurisprudence as follows at 376-377:
[The engineering firm] contends as it is not liable in negligence to [the subcontractor] because an engineer owes no duty to anyone absent a contract. This position is contrary to the prevailing rule in a majority of jurisdictions, which recognizes the liability of those rendering "professional" services in situations in which the professional is negligent in the provision of services. See City of Mounds View v. Walijarvi, 263 N.W.2d 420, 423 (Minn.1978) ... Therefore, [the engineering firm] is liable in negligence to those who foreseeably relied on its professional services.
Next, we must decide whether a subcontractor who sustains economic loss due to negligent performance of a consulting engineer may foreseeably rely on the engineer's services. Courts in other jurisdictions have recognized a tort duty between design professionals and contractors when the harm to the particular plaintiff was foreseeable. See Donnelly Construction Co. v. Oberg/Hunt/Gilleland, 139 Ariz. 184, 677 P.2d 1292 (1984); Conforti & Eisele v. John Morris Associates, 175 N.J.Super. 341, 418 A.2d 1290 (1980); A.E. Investment Corp. v. Link Builders, Inc., 62 Wis.2d 479, 214 N.W.2d 764 (1974). We find it foreseeable that [this subcontractor] and other subcontractors, who were bound to follow the specifications prepared by [the engineering firm] could be harmed by [the engineering firm's] negligent drafting or interpretation of the specifications. Therefore, [the engineering firm] owed a duty to [the subcontractor] to reasonably draft and interpret the project's specifications. [footnote omitted].
In Muncy Area School Dist. v. Gardner, 91 Pa.Cmwlth. 406, 497 A.2d 683 (Pa. Commw.Ct.1985) the court affirmed the granting of a summary judgment in favor of an architectural firm against a plumbing contractor on the basis there was no issue of fact. In Gardner, the contractor alleged the architectural firm negligently misinformed him of the specifications he needed to properly bid the job. The Gardner court noted the contractor's theory of liability as follows 497 A.2d at 688:
Appellants' theory of tort liability is founded upon Section 552 of the Restatement of Torts Second (1965) which provides:
Section 552 Information negligently supplied for the guidance of others.
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information *725 for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
In Westerhold v. Carroll, 419 S.W.2d 73 (Mo.1967) the Supreme Court of Missouri adopted a balancing test to be applied on a case by case basis in determining whether a cause of action exists. The court held at 81-82:
"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm" Biakanja v. Irving, 49 Cal.2d 647, 320 P.2d 16, 65 A.L.R.2d 1358. Each and every one of the above elements are not absolutely necessary to authorize an action to be maintained, but we consider all to be satisfied in this case except we doubt that any "moral blame" can be leveled at defendant. When we consider that the other elements are present, and also consider that the usual reasons for limiting actions for the negligent performance of a contractual duty to those in privity of contract are absent, we conclude that the overall policy considerations weighs heavily in favor of the right of plaintiff to maintain this action under the factual circumstances alleged in the petition.
In the instant case the factual allegations of the petition indicate the person to be injured by the architect's negligence was known, i.e. the contractor. These facts also state allegations showing it was foreseeable that the contractor would be injured by the architect's negligence. The allegations further show there was certainty the contractor would be injured by the architect's negligent actions and failure to act. The allegations also indicate there was a closeness between the injury suffered and the architect's conduct so that the contractor is in a class of persons "whose connection with the transaction was so close `as to approach that of privity, if not completely one with it'"[.] Westerhold at 78.
Furthermore, in the instant case as in the case of Westerhold the architect is not being exposed to "unlimited liability to an unlimited number of persons." Id. at 79.
Thus, we adopt the Westerhold balancing test and conclude the petition states a cause of action. Since the allegations in the reconventional demand "set forth a cause of action as to any part of the demand, the exception must be overruled." Franks v. Duvall, 576 So.2d 1194 (La.App. 5th Cir.1991) at 1195. Accordingly, we render judgment overruling the exception of no cause of action filed on behalf of appellants.
Colbert now appeals and specifies the following errors:
1. The trial court should have granted the exception of prescription filed by Colbert against the individual claim of Carvin;
2. The trial court erred in allowing double recovery on that part of a judgment in favor of B.F. Carvin Construction Company, which had received an arbitration award for all of its contract damages;
3. The trial court wrongfully allowed the introduction of conjectural and speculative evidence concerning B.F. Carvin Construction Co.'s claimed losses for extended overhead and loss of anticipated profits, and
4. The trial court erred in granting the motion for a judgment notwithstanding the verdict.

PRESCRIPTION:
Colbert filed an exception of prescription as to the claim made against him by B.F. Carvin individually. He urges that on December *726 26, 1986 B.F. Carvin's company was put in default. B.F. Carvin filed his reconventional demand June 9, 1988. Carvin admits in brief that a notice of default was entered January 28, 1987. Carvin asserts Colbert's refusal to certify the work performed by his company as accepted or substantially complete by labor day of 1986 caused him mental anguish. Carvin testified that as of the time of trial Orleans Parish School Board had not yet released his bonding company although it has agreed to its release.
Carvin argued prescription has not lapsed on the basis the tort is a continuing one. He relies on South Central Bell Telephone v. Texaco, Inc., 418 So.2d 531 (La.1982) in support of his position. The trial judge overruled the exception on the basis the tort was a continuing tort. We disagree and conclude his individual claim is prescribed.
The Louisiana Supreme Court held a continuing tort to be one in which "the tortious conduct and resulting damages continue." South Central Bell Telephone, supra at 533. [emphasis added]. The trial judge was manifestly erroneous in concluding the tort was continuing since the default or alleged tortious conduct occurred only once and was not continuing. Accord Hamm v. Amy, 544 So.2d 691 (La.App. 3rd Cir.1989) where although the damages were continuing, the alleged tortious conduct was not.

ARBITRATION:
The trial judge refused to allow evidence of the affirmative defense of arbitration on the basis the suit was in tort and not in contract. However, the trial judge did allow Colbert's counsel to use sworn testimony from the arbitration proceeding for the purposes of impeachment. In support of this argument he points to the following stipulation filed into the record by Carvin, individually, and Carvin Construction Company. That stipulation reads:
Plaintiffs in reconvention, B.F. Carvin Construction Company, Inc. and B.F. Carvin, do hereby stipulate that the amounts claimed in paragraph XII. of the Reconventional Demand, as amended, should be reduced as follows:
Remaining amount due on contract with Orleans Parish School that has wrongfully been held for reasons of fault and negligence on the part of defendant in reconvention: $130,629.00 reduced by $81,448.00 leaving a claim of $49,181.00.
Uncompensated for extras: $179,408.00 reduced by $42,040.00 leaving a claim of $137,368.00. Total: $650,037.00 reduced by $123,488.00 leaving a total claim of $526,549.00.
That stipulation, however, does not specify the amounts are to be reduced due to an arbitration and award made by Orleans Parish School Board.
Colbert also suggests payment by the school board was judicially confessed in Carvin's "Memorandum in Support of the Motion to Strike Affirmative Defense and to Limit Testimony Accordingly." That memorandum was filed on behalf of Carvin and Carvin Construction Company. It stated in pertinent part:
Previously, B.F. Carvin Construction Co., Inc. arbitrated with the Orleans Parish School Board the contract between those two parties and received an award.
La.Civ.Code art. 1853[1] provides:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
A judicial confession is indivisible and it may be revoked only on the ground of error of fact.
In a case involving an admission in a previous judicial proceeding the Louisiana Supreme Court held:
A judicial confession under Article 2291 is a party's explicit admission of an adverse factual element; it has the effect of waiving evidence as to the subject of the admission. Jackson v. Gulf Insurance Company, 250 La. 819, 199 So.2d *727 886 (1967); Farley v. Frost-Johnson Lumber Co., 133 La. 497, 63 So. 122 (1913). Moreover, a judicial admission does not estop the confessor from denying the correctness of his earlier admission unless the party claiming the benefit from the confession has relied on that admission to his prejudice. Johnson v. Kennedy, 235 La. 212, 103 So.2d 93 (1958); Succession of Turner, 235 La. 206, 103 So.2d 91 (1958); 19 La.L.Rev. 433 (1959).
Crawford v. Deshotels, 359 So.2d 118, 122-123 (La.1978).
Although Crawford concerned admissions made in a prior judicial proceeding we have applied the Crawford rule to judicial admissions made in the same proceeding. Jones v. Gillen, 564 So.2d 1274, 1279 (La. App. 5th Cir.1990), writ denied, 568 So.2d 1080, 1081 (La.1990).
In Jones, supra at 1279 we interpreted La.Civ.Code art. 1853 as follows:
the statement constituting a judicial admission must be the express acknowledgement of an adverse fact, the effect of which is to waive evidence as to the subject of the admission or to withdraw the matter from issue. Cheatham v. City of New Orleans, 378 So.2d 369 (La. 1979). For these effects to be imposed, however, the other party must have been led to believe the fact was not at issue or he must have relied on the statement to his detriment. Cheatham v. City of New Orleans, supra; Crawford v. Deshotels, 359 So.2d 118 (La.1978); Lewis v. Williamette Industries, Inc., 499 So.2d 506 (La.App. 2 Cir.1986). Otherwise the party making the admission can withdraw the statement. Crawford v. Deshotels, supra; Lewis v. Williamette Industries, Inc., supra.
At trial Carvin testified his company had not received full payment from the school board. He stated the balance due on the contract "less the retainage of five percent" was $49,181.00. He also testified that although the school board had agreed to release his bonding company it has not yet done so.
Colbert's counsel made a proffer at trial which was limited to eliciting testimony for impeachment purposes. No evidence of the arbitration was introduced.
Colbert was given ample opportunity to proffer evidence regarding the arbitration proceeding and did not do so. The trial judge also stated he would give no double recovery if that were the case. There is no showing Colbert was led to believe the arbitration "was not at issue or [that] he must have relied on [any statements made by opposing counsel] to his detriment." Jones, supra at 1279. Even assuming the statements made constitute a judicial admission, the Jones test has not been met. Moreover, Colbert's failure to proffer any evidence regarding the nature of an alleged double recovery via an arbitration proceeding waived his right to appeal that issue. McLean v. Hunter, 495 So.2d 1298 (La. 1986).

J.N.O.V.:
The jury found Colbert negligent and that negligence to be a legal cause of the damages sustained by "Bill Carvin and/or B.F. Carvin Construction Co., Inc." However, although the jury interrogatories required a finding of negligence on the part of "Bill Carvin and/or B.F. Carvin Construction Co., Inc." the jury was not asked whether the negligence it attributed to these parties was a legal cause of the injuries sustained. However, no objection was made to the interrogatories before the jury retired and therefore there has been a waiver of the defect. St. Pierre v. General Am. Transp. Corp., 360 So.2d 595 (La. App. 4th Cir.1978), writ denied, 362 So.2d 1386 (La.1978).
Negligence was apportioned as follows: Colbert vis a vis Carvin 50% each; Colbert vis a vis B.F. Carvin Construction Co., Inc. 47%. Carvin was awarded $29,000.00 damages and B.F. Carvin Construction Co., Inc. was awarded $89,763.00 in damages.
B.F. Carvin Construction Co., Inc. and B.F. Carvin filed a motion for judgment notwithstanding the verdict and alternatively for a new trial. They attached nine affidavits of jurors averring each did not understand the trial judge's instructions *728 that the amounts of damages given by the jury would be reduced by the percentage of negligence. Instead these jurors averred they made the reduction themselves so that the amount of damages awarded was not the full amount intended. The Carvin interests requested the trial judge readjust the damage awards and reapportion fault. They argued Carvin and his company should only be assessed 25% at fault.
On September 25, 1990 the trial judge granted a JNOV and awarded Carvin $29,-000.00 and $89,763.00 for B.F. Carvin Construction Company, Inc.
However, on October 4, 1990 the Carvin interests filed a motion for new trial limited to reargument. They argued in brief it was error for the court to rely on the affidavits of the jury as a basis for granting the JNOV. The general rule is that "a juror cannot be heard to impeach the jury's verdict." Cosie v. Aetna Cas. & Sur. Ins. Co., 527 So.2d 1105, 1108 (La.App. 1st Cir. 1988). Instead, the Carvin interests argued in brief that the trial judge examine the apportionment and amounts of damages after considering all of the evidence and reasonable inferences in a light most favorable to Colbert. They asserted that the facts and inferences point so strongly and overwhelmingly in favor of the Carvin interests that a JNOV should be granted.
On December 19, 1990 the trial judge granted the motion for new trial limited to reargument. He also granted the JNOV and rendered judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that a judgment notwithstanding the verdict be entered in this matter in favor of plaintiff-in-reconvention, B.F. Carvin Construction Company, Inc. and B.F. Carvin, and against defendant-in-reconvention, Charles R. Colbert, in the amount of $190,985.10 for B.F. Carvin Construction Co., Inc., reduced by 25% representing its negligence and $58,-000.00 for B.F. Carvin, reduced by 25% for the negligence of B.F. Carvin, together with legal interest from the date of judicial demand until paid. All costs are assessed against the defendant-in-reconvention, Charles R. Colbert.
In granting the JNOV the trial judge stated he was applying the proper standard and was not relying on the jury's misinterpretation of instructions.
Appellant argues in brief the trial judge's actions "were a transparent manipulation obviously influenced by the juror's Affidavits." He contends the jury verdict should be made the judgment of this court. We disagree with appellant's contention the trial judge's actions were a "transparent manipulation." The trial judge articulated the proper standard and supplied detailed reasons for the granting of the JNOV.
The proper standard for granting a JNOV was recently articulated by the Louisiana Supreme Court in Anderson v. New Orleans Public Service, 583 So.2d 829, 831-832 (La.1991) as follows:
The article controlling the use of JNOV is LSA-C.C.P. Art. 1811. The article does not specify the grounds on which a trial judge may grant a JNOV. In Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), we set forth the criteria to be used in determining when a JNOV is proper. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
The Supreme Court also enunciated the standard for appellate review in Anderson, supra at 832:

*729 In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

NEGLIGENCE AND THE APPORTIONMENT OF FAULT:
Recently, the Louisiana Supreme Court restated the basis for determining liability in negligence. Fox v. Bd. of Sup'rs of La. State Univ., 576 So.2d 978, 981 (La.1991):
The duty-risk analysis is helpful in determining liability in negligence actions. Thus, for liability to attach, plaintiff must establish that:
(1) The conduct in question was a cause in fact of the resultant harm;
(2) The defendant owed a duty to plaintiff;
(3) The duty owed was breached; and
(4) The risk or harm caused was within the scope of the breached duty. Mart v. Hill, 505 So.2d 1120 (La.1987); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
See also Socorro v. City of New Orleans, 579 So.2d 931 (La.1991).
In M.J. Womack, Inc. v. State House of Rep., 509 So.2d 62 (La.App. 1st Cir.1987), writ denied 513 So.2d 1208, 1211 (La.1987) a contractor sued an architectural firm for economic loss allegedly caused by delays of the firm. In discussing the standard of care owed by the architect the First Circuit held at 64:
The architect's duty is not to provide perfect plans but to exercise the degree of professional care and skill customarily employed by other architects in the same general area. The court also held [citing Pittman Construction Co. v. City of New Orleans, 178 So.2d 312, 321 (La. App. 4th Cir.1965), application denied, 248 La. 434, 179 So.2d 274 (1965)]:
expert testimony is not always required to establish the standard of care for physicians, and if "lay persons can infer negligence" by applying "a common sense standard" in the case of physicians, then an architect's negligence may on occasion be established without reference to expert testimony [citations omitted].
Id. at 65. Accord D & O Contr. v. Terrebonne Parish Sch. D., 545 So.2d 588 (La. App. 1st Cir.1989), writ denied, 550 So.2d 654 (La.1989). We agree; however, we note that in Sams v. Kendall Const. Co., 499 So.2d 370 (La.App. 4th Cir.1986) the Fourth Circuit held expert testimony was necessary.
We have held:
[an architect] is not liable for mere errors of judgment. His liability attaches only when his conduct falls below the standard of skill and care exercised by others engaged in the same profession in the same locality.
Seiler v. Ostarly, 525 So.2d 1207, 1209 (La.App. 5th Cir.1988). Accord McKeen Homeowners Ass'n, Inc. v. Oliver, 586 So.2d 679 (La.App. 2nd Cir.1991).
Our review of the testimony below compels us to conclude that in view of the Anderson standard it was not error for the trial judge to grant a JNOV as to the apportionment of fault. The bulk of the evidence presented on this issue was uncontroverted so that it was impossible to say that reasonable men could not reach a different conclusion but to apportion Colbert as having a significantly greater percentage of fault. Anderson, supra.
Applying the Anderson standard we also conclude the trial judge correctly found Colbert was negligent. Colbert owed Carvin Construction Company the duty to use reasonable skill and care in the preparation of plans on which Carvin relied *730 on for bidding and performance; the duty to inspect and supervise the work, and the duty to write change orders when requested for hidden defects when these were properly submitted by Carvin. Colbert breached his duty. That breach caused the economic loss complained of by Carvin Construction Company. The risk and harm Carvin Construction Company encountered fall within the scope of protection afforded by that duty. The harm to Carvin Construction Company is easily associated with deviation from the rule that Colbert use reasonable skill and care in preparing plans and in performing his supervisory duties under his contract with Orleans Parish School Board. See Fox, supra; Socorro, supra; M.J. Womack, Inc., supra.
The testimony at trial set forth the following.
Colbert, an architect, testified he did preliminary drawings for McDonough Number 36. A reduction of the final working drawings for that school were attached to the plans for renovation introduced into evidence as Plaintiff's Exhibit 5. These plans were stamped "CHARLES COLBERT, ARCHITECT-PLANNER." Colbert admitted designing McDonough Number 36 and being the architect for the renovation of that school, the project at issue.
Plaintiff's Exhibit 1, "Procedures and Related Standards to Use With Architectural Programs for Existing Buildings and Facilities" was introduced. That document provides in pertinent part on page 1-2:
Neither the Orleans Parish School Board nor any of its Departments or employees have the expertise to determine that the plans and specifications of the architect are sufficient or comply with any applicable codes or standards. The Orleans Parish School Board looks to the architect as an independent contractor for design and as its agent for construction administration.

INVESTIGATIVE PHASE/ADEQUACY OF SPECIFICATIONS AND PLANS/ CHANGE ORDER:
After receiving the contract documents Colbert said he visited the site. Colbert testified initial inspection did not include "scaffolding, digging, [or] cuttin[g]." He did, however, make roof cuts in order to determine the condition of the roof. He stated that the School Board wanted certain investigations to be done while the work was implemented. For example, it required the contractor to test the roof drains. He stated architects do not perform this test because they do not have the labor necessary to do so. He also stated that the architects' testing of the roof drains during the investigative phase was not traditionally done.
However, John Coleman Bartley, Carvin's expert General Contractor, with a subspecialty in school renovation work, testified it is not the obligation of the contractor or subcontractor to determine the work to be done for the owner. Instead, these parties "must depend on the fact that the architect is the representative of the owner, [and] has incorporated everything that the owner feels needs to be done." Bartley stated he visited the site after construction and reviewed all contract documents. He said the specifications regarding doors, windows, and hardware were vague.
Colbert explained that during the investigative stage of this school renovation which took several weeks he performed the following: photographing conditions requiring attention; walking along the outside of the school making notes on floor plans and elevations; walking along its interior and noting work to be performed; examining the ceiling and floors, and having mechanical engineers, electrical engineers, hydraulics experts, and plumbing experts make observations. Colbert felt he had investigated sufficiently to write specifications and to draw plans which would be clear as to the quality and quantity of the work to be performed.
In contrast, Marjean M. Gould, Carvin's project manager and estimator for the project, testified Colbert's specifications listed "three possible manufacturers" of replacement window parts. All of these manufacturers were out of business. Gould stated it took several months to find *731 a company who could manufacture the replacement parts.
Carvin also contradicted Colbert's testimony regarding the adequacy of the specifications. Carvin testified as follows.
Carvin stated the windows had been a problem for years and they had been previously modified. These windows "were never made to be waterproof." The doors were outdated and obsolete.
He stated Colbert "was not knowledgeable of what problems existed or really what to do with the problems [of the windows]." There were no plans as to the method of repair; the blueprints were wrong. He stated, "We wound up in a situation where it cost us a considerable amount of money to perform the work that needed to be performed. Basically, the blueprints were somewhat misleading in this area."
Colbert testified his drawings of the windows on the plans carried the notation: "These drawings are a mere convenience, full responsibility for a full understanding of material, allowing its reuse, is the sole responsibility of the bidder-contractor." Colbert stated it was the contractor's obligation to survey and to determine the ratio of those panes which could be saved. However, Carvin disagreed and stated it was Colbert's job to determine the number of useable windows.
Richard Dennis Oehler, Carvin's expert in the field of architecture with a sub-specialty in public school renovation, testified that Colbert's notation on the window plans that this was a "mere convenience" was improper. He also said that on a renovation he would "check window through window by window" to determine the work needed. Thus, he felt the architect should thoroughly investigate the project.
On the other hand, Anthony J. Gendusa, a defense expert architect with a subspecialty in the field of school renovation, testified he reviewed Colbert's plans and specifications and felt they gave a contractor adequate notice of the work to be done.
Colbert stated after the investigation he made preliminary phase drawings. After their approval by the School Board he made working drawings, i.e. the plans and specifications.
Colbert agreed the following was part of his contract with the School Board:
the Architect and his consultants shall prepare for written authorization by the Owner ... complete final Construction Contract specifications and working drawings, all sufficiently complete and clear to define the quantity and quality of the work to bid and to complete the Project[.]
Counsel read to Colbert the following contract provision located in Article 5.1.1.1 regarding "Program Completion Phase":
[T]he Owner will provide all necessary drawings, where they exist, at no cost to the Architect for use in developing The repair Project. Where drawings do not exist, the Architect shall construct all necessary as-built drawings required to complete the Project, at no additional cost to the Owner.
Colbert explained the drawings/plans he furnished complied with the requirements of the contract. Counsel referred Colbert to the "Procedures and Related Standards", Article 4 in the General Conditions. That article provides:
The Architect shall furnish, with reasonable promptness, additional instructions by means of drawings, or otherwise, necessary for the proper execution of the work. All such drawings and instructions shall be consistent with the Contract Documents, true developments thereof, and reasonably inferable therefrom. The work shall be executed in conformity therewith and the Contractor shall do no work without proper drawings and instructions.
Colbert recalled Carvin's requesting additional instructions from him and that these requests were complied with "whenever reasonable."
Gould testified:
The first major problem arose when the plumbing subcontractor went to replace the roof drains and found that the roof *732 drains that were specified, were not adequate, or would not work for with the situation that was there.
* * * * * *
The existing roof drains were, as you come down out roof [sic], you have a trap that connects on to a drain [leader]. These roof drains drain inside the building to a vertical, went into the slab and out through the subsurface. The existing roof drains came out at a forty-five [degree angle] and connected on to a round, I mean square pipe.
However, "the specified roof drain was a ninety degree roof drain." Gould stated:
It wouldn't work, not only because of its ninety degree angle, there wasn't the room there to work with, but it was a round connection to an existing square connection.
The plans showed a round to round connection "which was not at all the situation." When this problem was discovered they "had probably half of the roof off, and were not able to put roof drains into the right drains on this roof." Gould stated the children were due back from the Easter holidays in a few days. Carvin's company had to close the roof over the roof drains.
She testified the company got "no adequate direction from either the architect or from the engineer, as to how to solve this problem." Colbert took the position Carvin should have known "that [the] square [leader was] going to connect to that round drain." Gould stated, "He [Colbert] would never consider any type of extra work for anything." The only change order Colbert approved was one for the "sound and fire alarm system" which he did "against his wishes."
Colbert stated he recalled Carvin's seeking additional instructions regarding a round to square connection from the round roof drains to the square rainwater conductors. Colbert admitted being alerted to the problem prior to March 17, 1986, the date of a letter from Carvin placing him on notice. He further stated he received letters dated March 19, 1986 and April 7, 1986 regarding this problem.
Colbert admitted he did not provide additional instructions or drawings as required by Article 4. He stated no drawings were needed. He refused to authorize additional costs for this problem.
Colbert testified that on the original plans for construction of the school the square to round connection is found on sheet A-21 but that this drawing is not an "as built" drawing. The location of the round to square connection on this drawing is inaccurate as the connection is "very near the roof drain, itself, not over the wall like this[.]" However, he admitted the drawing of the roof drain on the renovation plans did not show a round to square connection; "[i]t only shows a round pipe." Colbert stated there was no drawing alerting the contractor the necessity of making a round to square connection. This condition was a hidden one. While he admitted a change order would be appropriate he qualified his response as: "If appropriately requested, it would be correct." Colbert stated a change order was "[n]ot appropriately [made] or [made] with any backing, or with reasonable prices."
When the first roof drain was hooked up Carvin stated he discovered "the existing drain system" was rusted. Carvin wrote Colbert "almost immediately." Colbert responded by stating it was Carvin's "responsibility to repair it." Carvin testified the repair of the drainage system was not included in the plans and specifications and was therefore not considered in Carvin's charges to the School Board. The scope of his work was only "to replace the roof drains, the drain, itself." Carvin asked for instructions from Colbert as well as a change order. Carvin described the purpose of a change order as follows:
In most renovation projects, there is [sic] a number of hidden conditions. It's not practical to believe that a school the size of that, that covers a city block, that one person or any group of people is going to know detail [sic] of deficiency of the school. It's just not practical to think that way ... most renovation jobs have a lot of modifications on them[.]
*733 Carvin testified there were no modifications approved by Colbert on this project.
The problem with the rainwater leaders prevented Carvin from completing his contract due to a severe delay of eight weeks. As a result he "couldn't do any of the finishing work in the classrooms until the roof drains were changed." Additionally, the leaks in the rainwater conductors caused leaks in the classrooms. Carvin said he was awaiting instruction on this problem from Colbert before he could prepare a change order.
Lucien T. Vivien, Jr., the project engineer, however, stated there was nothing unusual in Colbert's failure to designate a round to square connection. Vivien admitted that despite Carvin's repeated requests for drawings of the round to square connection he did not provide Carvin with any.
Ronald G. Berkwest testified he was employed by Orleans Parish School Board as Chief Construction Coordinator in July, 1983. At the time of the renovation at issue he was Project Coordinator and Chief Construction Inspector. He stated the problem with the round to square connection "was fairly insignificant."
The contract documents contained a procedure for executing a change order. Colbert stated he did not execute a change order because:
I contend that there was no basis for pricing or knowing how many replacements and so on were needed; and therefore, there was no way to execute a change order, because there had been no hose, [sic] test there had been no opening up and allowing the architect the needed observation.
Colbert testified during the project it was also discovered that the roof leaders were rusted. He admitted receiving a letter dated April 24, 1986 from Carvin indicating the rusted roof drains and advising "the owner make a thorough investigation of the [leaders] and down pipes for possible replacement before considerable portions of the job are completed."
Colbert testified he received Carvin's letter of May 27, 1986 advising him of leaks and asking for guidance. Colbert stated he could not tell Carvin how to repair the leaks until he knew their number and location. Although Carvin requested a change order Colbert testified he refused to execute one because he felt the responsibility for the repair of the leaks was within the scope of Carvin's work.
Oehler testified rainwater conductors and leaders were unknown conditions. He explained:
during the bidding procedure the contractor would have had to remove some of the ceiling in order to view the conditions. Normally, in a bidding procedure, I don't think the owner allows the contractors, or I have never been a party to where the owner allows the contractors to go in and do some constructive research. It's usually the architect that does the constructive research, as part of his survey, and therefore, makes a determination of how to correct the detail ... there would have been no way of Mr. Carvin knowing what the detail was, other than what was on the drawing, and he [has] to assume that that was correct, and therefore, couldn't have bid it any other way, and I doubt that any other contractor bid it any other way either.
Oehler stated in this case "a change was required, whether that be a field order or [a] change order." The general contractor is not responsible for hidden conditions not included in the plans or specifications. He estimated an architect would have seven to ten percent of a renovation involve change orders.
Bartley was referred to the following provision in the general conditions:
Other than in an emergency endangering life or property, no extra work, or change in the work, including that not involving extra cost, shall be made by the contractor, except in pursuance of a written order from the owner, countersigned by the architect.
Bartley testified it was the architect's obligation to institute a change order. No change orders were executed by Colbert to deal with unforeseen or hidden conditions. Bartley has never had a situation in a renovation *734 situation where a change order was not made.
Bartley stated that the round to square connection was "absolutely" a hidden condition. This could normally be the subject of a change order involving extra expense.
One of Colbert's reasons for refusing to authorize payments to Carvin was the problem with the roof drainage system. On December 26, 1986 he wrote to Dr. Smith, the Director of Facility Planning, recommending Carvin's company be placed in default due to problems with "[t]he leaking roof drains and drainage system, and the windows."
Regard another phase of the project Colbert stated he intended for two rainwater conductors to hook into a terracotta line originally installed in the early 1950's. Colbert believed Carvin's men had destroyed this line with a backhoe; he did not believe the line had collapsed as indicated by Carvin. However, he stated he did not know whether the line was in working order before the men began the work. Colbert admitted Carvin wrote him on March 20, 1986 informing him "the storm drain was too high to make a connection[.]" He said Carvin also informed him that in cleaning the terracotta line the line/pipe collapsed. Although Carvin felt this was a hidden condition, Colbert did not agree. Colbert felt Carvin should have allowed for this contingency in his bid. Carvin asked for a change order for this problem.
Colbert testified Carvin requested a change order in the amount of $4,467.00 for removal of the sidewalk and other work involved in this repair. Colbert stated he refused the change order on the basis the cost was excessive; the sidewalk did not need removal, and the work was the responsibility of the contractor.
Carvin testified that when the plumber flushed out the storm drain system "pieces of broken terracotta started coming out of it." He wrote Colbert. He stated Colbert answered that the problem was Carvin's responsibility. Carvin said he installed a new subsurface drainage line.
Oehler stated he was brought out to look at the drainage system connection to the sewer line and stated:
it should have been a change order, because it was an unknown condition. There was no way that the contractor could have ever known or bid the condition that was existing. Again, he could only bid what's on the drawings and what he could see, and not something that is buried under the ground.
Bartley testified also that a hidden condition concerned the connection of the roof drainage lines to the sewerage line. He stated this condition would result in a change order with extra costs involved.
Vivien testified he did not know whether the sewer line had been damaged by excavation or aging. Vivien admitted the sewerage line problem would be a subject for a change order.

SUPERVISION:
Bartley was referred to the general conditions which stated: "The architect shall supervise the work to the best of his ability and judgment[.]"
He testified the architect in this case was required to provide the contractor with additional instructions whenever problems arose. He said under the terms of this contract it was reasonable for the contractor to expect the architect to make inspections as requested. Bartley described the relationship between an architect and general contractor on a renovation project such as this as follows:
It almost becomes a partnership, except with respect to, you know, there's not [sic] legal partnership or liabilities, as it would between two partners in a business.
He stated:
It's almost a certainty that unforeseen hidden conditions, in some part of the job, or some portion of the work, will arise.
Bartley said his review of the correspondence between Carvin and Colbert indicated to him that Colbert refused to make timely inspections.
*735 Gould stated Colbert did not provide supervision. With one exception he did not provide additional information as requested.
Colbert stated he recommended Carvin, as the lowest bidder, be awarded the contract. After the work begins the architect's role is to observe rather than supervise. Colbert stated that although the specifications refer to the architect as a supervisor, his opinion was that the architect is not a supervisor.
Article 30 of the specifications defines "ARCHITECT'S STATUS" as:
The Architect shall be the Owner's representative during the construction period, to the extent provided in the Contract Documents and as otherwise provided in writing.
The Architect shall supervise the work to the best of his ability and judgment and he shall use his best endeavors to see that the Drawings and Specifications are strictly adhered to and complied with by the Contractor, but the Architect shall not be responsible for bad workmanship and improper materials that may have been incorporated in the work by the Contractor. The Architect has the authority to stop the work whenever such stoppage may be necessary, in his reasonable opinion, to insure the proper execution of the Contract.
Colbert admitted he was aware of the following provision in his contract contained in Article 5.1.5.1:
The Architect shall provide administration of the Construction Contract as set forth herein and in the Construction Documents.
Colbert agreed the specifications were the construction documents but continued to deny he had any obligation to supervise the work despite the above-quoted contract provisions defining that obligation.
Oehler testified the role of the architect in the construction phase is to:
inspect the work, to make sure that it meets the plans and specifications, and to certify to the owner that the work that the contractor is asking for on pay request, is the work that is actually performed[.]
Oehler said under the contract terms Colbert had an obligation to provide additional instructions. He also had an obligation to timely inspect when requested by the contractor.
Colbert admitted he refused to inspect the roof drains on May 6, 1986 as requested by Carvin. He stated he refused because they were not ready. Additionally, he refused to go daily to inspect but only stated he would come out for the final inspection. On a later date he observed most hose tests which he opined were "inept."
Colbert testified that in his (Colbert's) letter of December 26 he gave his reasons for terminating Carvin as:
Two very significant and major items of work remain outstanding. These are substantial leaks into the interior of the structure caused by the new roof and roof drainage system, and two, the aluminum windows and doors do not operate properly, have parts missing, and are a constant source of teacher complaints.
Andrew J. McPhate, an expert in the field of mechanical engineering, testified he was familiar with the windows on the school. He saw them March, 1987 and December, 1988. These windows could not be made water tight under normal use of opening and closing. The windows would have to be in perfect alignment with perfect gaskets to pass the water test given. McPhate stated that test was very difficult for these windows to pass.
Oehler stated he went to observe the water testing of the windows. He stated:
To try to hold a standard to a window that's thirty years old, that a lot of manufacturers would have a hard time meeting today, let alone the fact that they had taken the glass out of the window and put lexs and in, which traditionally weakens the structure of the window; and therefore, only complicating the matter that much more. What I had observed was with a high pressure hose, shooting at various angles, to see if it leaked. I would have been surprised if it didn't *736 leak, to tell you the truth. I wasn't surprised that it was leaking. It was an unrealistic test for the age of the window and for the type of window it was. I doubt very seriously, if these windows brand new, when they were installed could have even met up to the test that was required.
Bartley stated he examined the windows and felt that no matter how hard one tried a satisfactory result could not be obtained. He said there were "difficulties that were inherent in [the] design [of these windows.]"
Gendusa testified he went to the job site in Fall, 1987. He stated the school board is currently developing a contract for the renovation of the school. It proposes introducing a different type of window system. Gendusa questioned the water tightness of these windows.

FINAL INSPECTION/SUBSTANTIAL COMPLETION:
During Colbert's testimony the following contractual provision was referred to:
The architect shall arrange for and give adequate notice to and conduct the inspection at the completion of the work as required under Article 66 of the General Conditions. The architect shall prepare a list of items requiring minor corrective work or completion on the project and distribute the same to all parties concerned. If more than minor corrective work remains, then the architect shall so inform the Owner and Contractor. The Contractor shall notify the architect when the project is ready for further inspection to allow the architect to issue a Certificate of Substantial Completion, if appropriate. The architect will conduct subsequent inspections, without additional compensation, until a final inspection is conducted and the work has been determined to have been executed in full and exact compliance with the Contract Documents and Specifications. At such time, the architect shall receive, review and forward to the owner all guarantees, operation and maintenance manuals, keys, final certificate of payment and other closing documents as required by the Contract Documents prior to the acceptance of the work as provided for in Article 67 of the General Conditions.
Oehler stated Colbert wanted to vary the contract terms by making the contractor responsible for the classrooms until the entire project had been substantially completed. This was not the school board's standard procedure since teachers and students could damage the occupied classrooms after the contractor had completed his work. He said some rooms could be occupied a year prior to the entire project being substantially completed.
Berkwest testified if the architect did not certify the project was substantially complete the school board could do nothing.
Carvin stated he lost a week when Colbert refused to inspect the second group of classrooms. He refused to do so telling Carvin's superintendent he needed the request in writing. When the superintendent wrote the request Colbert insisted it be mailed from Carvin's office. Carvin further stated:
[A]ll work was completed on the site in the middle of August, the third week of August, 1986. Now, again he refused to inspect the buildings and give us the opportunity to correct any deficiencies that may exist before the children come back to school. We wound up inspecting it on the day before school started, which meant that we had to make any corrections while the children were in the classroom, which is the most difficult circumstances.
Carvin testified Colbert indicated this was only a "courtesy" rather than a "final" inspection. Colbert refused to make a final inspection even up to the time of trial.
Colbert's testimony included his description of slides depicting allegedly unworkmanlike performance on the part of Carvin. Vivien, Berkwest and Gendusa also testified to Carvin's unworkmanlike performance. Although Colbert described problems with the installation of the fence Oehler disagreed.
*737 Oehler stated he found Carvin's work comparable to other contractors who worked for the school board. Bertley also testified Carvin's work was "absolutely" acceptably performed.
Carvin testified Colbert wanted Carvin to provide a warranty on the adjacent buildings. Carvin said that Colbert refused to pay Carvin for his work unless the warranty on the adjacent buildings was provided. However, Carvin did not perform any work on these as these were not included in his contract.
Oehler stated this required warranty on the roofing of another part of the building was not customarily done.

QUANTUM:
The trial judge awarded $190,185.10 in damages whereas the jury had awarded only $89,763.00. Appellant also specifies as error that two items of damages claimed by Carvin were too speculative so as to afford relief. He asserts "fixed overhead" and "loss of anticipated profits" were too speculative.
Appellant argues Carvin claimed fixed overhead from May 2, 1986 to October 6, 1986 due to Colbert's failure to inspect when Carvin admitted from May 2, 1986 to August 30, 1986 he was working pursuant to the contract. Appellant also argues that the eight weeks claimed for the roof drain problems was also time Carvin was actively performing his contract. Finally, he asserts the eleven weeks claimed of October 6, 1986 to December 26, 1986 for Colbert's refusal to do a final inspection was improper since Carvin stated the job was substantially complete as of the end of August, 1986.
Although appellant mentioned in brief it was error for the trial judge to allow testimony of a speculative nature we note no such objection made by counsel to the testimony.
We conclude from our examination of Carvin's testimony regarding damages it was not error for the trial judge to grant a JNOV as to the amount of damages. Carvin was the only person to testify regarding damages. From the testimony presented below we find his testimony uncontroverted so that it was impossible to say that reasonable men could not reach a different conclusion but to award the amount set by the trial judge. See Anderson, supra.
Furthermore, Carvin admitted at trial his claim for loss of anticipated profits was "speculation." He gave no amount for this claim. The award by the trial judge was actually $6,650.41 less than the amounts testified to by Carvin regarding the balance owed on the contract; the extended office overhead, and the uncompensated for extras described below. Thus, the trial judge evidently did not award damages of a speculative nature.
Carvin testified his company sustained damages as a result of Colbert's actions or failure to act. He denied receiving full payment from the school board. He testified the balance owed "on the original contract was $49,181.00." He defined extended overhead as:
Extended office overhead is the loss of monies in the administrative portion of the company, due to Mr. Colbert's refusal and failure to provide proper instructions, refusal to make timely inspections, and refusal to close the job out.
Carvin said he sought extended overhead for the following:
One is the lack of instructions on the roof drainage situation, which delayed us in completing the classrooms, by approximately eight weeks ... it amounts to eighteen thousand, one dollar, and thirty-one cents.
* * * * * *
The second part of it would be Mr. Colbert's failure to make timely inspections, refusal to make timely inspections, and various periods in the job, as referenced by the example that I gave you this morning. This was not an isolated incident. It was rather more common, and as a result of those refusals, we lost a total of six weeks on the production of the job.
* * * * * *

*738 It's thirteen thousand, five hundred and ninety-eight dollars. Thirteen thousand, five hundred dollars, and ninety-eight cents, I'm sorry.
* * * * * *
the third portion of the extended overhead claim is for the period from 10-6-86, up to and including 12-26-86, at which time the School Board put me in default of the contract. A period of eleven weeks ... Twenty-four thousand, seven hundred and fifty-one dollars... It's the overhead cost between those periods for having to continue to man the job.
* * * * * *
Mr. Colbert refused to provide a final inspection, refused to close the job out, and necessitating our continuing to man the job and provide administrative and overhead services to man it.
Furthermore, Carvin stated it was customary for a contractor to make 10% (as per the specifications) profit on overhead. The total amount of overhead damages claimed with the 10% profit was $61,879.51.
Carvin also claimed damages for uncompensated for extras. He testified to these as follows:
The first is for the extended bond costs. The bond [sic] never been cancelled on the job, yet. According to the State Insurance Commissioner's Office, and according to the rules that bonds are played by, the bond is only good for a certain period of time, and after that period of time has elapsed, then the premium is one percent per month, until such time that the bond is cancelled. In this particular case, the additional charges amount to fourteen hundred and thirty dollars.
He stated the contractor is customarily entitled to a profit on that amount making a total claimed of $1,646.00.
Carvin additionally sought uncompensated for extras for:
[t]he extended job [site] supervision on the job. We had to continue to man the job, after the job was finished and during times, the job was stretched out much longer than it should have been, due [to] the actions and circumstances on the site.
He stated it was customary for the contractors to receive overhead for the above with 10% profit. The total amount of his claim for extended job site supervision was $13,135.00. This amount is separate from extended office overhead. This amount relates to supervision in the field while extended office overhead relates to administrative overhead.
Carvin also sought a claim for uncompensated extras for continually maintaining the trees. That amount, including overhead and profit was $184.00. Another extra was for "[s]pecial top soils, seeds, and sod." This amounted to $769.00 including overhead and profit.
Since only 10% of the existing window material could be reused, although the plans led him to believe a substantial amount could be reused, he claimed $41,-051.00 in extras including overhead and profit.
He also had a claim for extras, including overhead and profit, for work on the subsurface drainage systems and the roof drains, which were outside the scope of the plans and specifications. This amounted to $16,160.00.
Another claim was for additional finished hardware not indicated on the blueprints. He claimed $1,035.00 including overhead and profit.
He also claimed an amount for repairing the insulative material beneath the floor tile and "mopping water and changing tile from the leaks in the drainage system." This amount was $11,979.00, including overhead and profit.
Accordingly, for the reasons stated that portion of the judgment overruling the exception of prescription is reversed and judgment is now rendered in favor of Colbert and against Carvin, individually, dismissing Carvin's individual claim. The exception of no cause of action on behalf of Colbert is overruled. The JNOV is affirmed in all other respects.
REVERSED IN PART; RENDERED IN PART; AFFIRMED IN PART; EXCEPTION *739 OF NO CAUSE OF ACTION OVERRULED.
PER CURIAM.
REHEARING REFUSED
Upon consideration of the issues addressed in Charles R. Colbert's and B.F. Carvin's applications for rehearing we adhere to the views expressed in our opinion rendered April 28, 1992. Additionally, we note no evidence of payment by a solidary obligor or of a double recovery was introduced or proffered. See page 727, wherein this court held "Colbert's failure to proffer any evidence regarding the nature of an alleged double recovery via an arbitration proceeding waived his right to appeal that issue. McLean v. Hunter, 495 So.2d 1298 (La.1986)."
NOTES
[1] The substance of La.Civ.Code art. 1853 was contained in former La.Civ.Code art. 2291 prior to January 1, 1985.